UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------------
Estate of Matthew Leombruno,

                Plaintiff,                19-CV-374 (TJM/CFH)

                -against-

The County of Greene, and Corrections
Sergeant Christopher Statham,

                Defendants.
-----------------------------------------------------

**Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment**

Dated:     New York, NY
            April 9, 2021

                    Eugene B Nathanson
                    Attorney for Plaintiff
                    80 Broad Street, 5th Floor
                    New York, NY 10004
                    212 227 3241
                    ebnesq@eugenenathanson.us

# Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Statement of facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

1.      Leombruno threatens suicide in phone calls with his daughter.  . . . . . . . . . . . . . . .  1

2.      Statham, who is incompetent to assess suicide threats, assesses Leombruno's threats
        as not serious. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

3.      The NYS Commission of Correction finds that Statham failed to recognize a serious
        suicide threat and failed to take proper precautions.  . . . . . . . . . . . . . . . . . . . . . . . . .  6

4.      Greene County charges Statham with incompetence.  . . . . . . . . . . . . . . . . . . . . . . . . .  7

5.      A prison suicide expert finds that Statham failed to recognize and respond to basic
        suicide prevention concepts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

6.      Officers at the Jail received no suicide training or refreshers and were ignorant of
        the Suicide Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Argument

I.      Statham violated Leombruno's due process right to protection from self-harm. . . .  10

        A.   The legal standard for deliberate indifference to a risk of a detainee's suicide.   10

        B.   Statham failed to meet the standard on all fronts. . . . . . . . . . . . . . . . . . . . . . . . .  12

        C.   Defendants' arguments and case law are inapposite.  . . . . . . . . . . . . . . . . . . . . .  13

        D.   Statham's summary judgment motion on the §1983 claim should be denied and
             Plaintiff's should be granted.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

II.     The County's suicide policy and lack of training caused Leombruno's suicide and the
        County is liable under 42 U.S.C. §1983.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

III.    Because Statham took no action to protect Leombruno in the face of a clear warning
        of a serious risk of self-harm, he is not entitled to qualified immunity.  . . . . . . . . .  22

IV.     Statham and the County of Greene negligently failed to protect Leombruno from the
        risk of suicide and are liable under state law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

V.      The evidence supports an award of punitive damages against Statham. . . . . . . . . .  24

VI.    Plaintiff's decedents suffered pecuniary loss and there is no failure of proof on that element of wrongful death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# Table of Authorities

*Bell v. Gillani*, No. 9:10-CV-1577 LEK/TWD, 2013 WL 5304188
(N.D.N.Y. Sept. 19, 2013)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*Allen v. Muskogee,* 119 F.3d, 837 (10th Cir. 1997), *cert. denied* 522 U.S. 1148
(1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Burke v. Warren Cty. Sheriff's Dep't*, No. 90-CV-597 (HGM), 1994 WL 675042
(N.D.N.Y. Nov. 25, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Case v. Anderson*, No. 16 CIV. 983 (NSR), 2017 WL 3701863
(S.D.N.Y. Aug. 25, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*City of Canton v. Harris,* 489 U.S.  378 (1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*City of Canton v. Harris,* 489 U.S. 378, 388-89 (1989)  . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Colburn v. Upper Darby Tp.*, 946 F.2d 1017, (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Conn v. City of Reno*, 591 F.3d 1081 (9th Cir. 2010), *cert. granted, judgment vacated sub
nom. City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), and opinion reinstated,
658 F.3d 897 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Darnell v. Piniero*, 849 F.3d 17 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14

*Farmer v. Brennan*, 511 U.S. 825 (1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Fontaine v. Cornwall*, No. 9:15-CV-432 (DNH), 2019 WL 4257136
(N.D.N.Y. Sept. 9, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Gonzalez v. New York City Hous. Auth.*, 77 N.Y.2d 663 (1991) . . . . . . . . . . . . . . . . . . . . .  24

*Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Hathaway v. Coughlin*, 99 F.3d 550 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Home Ins. Co. v. Am. Home Prod. Corp.*, 75 N.Y.2d 196 (1990) . . . . . . . . . . . . . . . . . . . . . 24

*Kelsey v. City of New York*, 306 F. App'x 700 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 10, 13, 14

*Kelsey v. City of New York*, No. 03CV5978(JFB)(KAM), 2006 WL 3725543
(E.D.N.Y. Dec. 18, 2006), aff'd, 306 F. App'x 700 (2d Cir. 2009) . . . . . . . . . . . . . 12, 13, 23

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lara-Grimaldi v. Cty. of Putnam*, No. 17-CV-622 (KMK), 2018 WL 1626348
(S.D.N.Y. Mar. 29, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 23

*Longmire v. McCoole*, No. 2:16CV653, 2017 WL 5931430 (E.D. Va. Nov. 30, 2017) . . . . . 17

*Matje v. Leis*, 571 F.Supp. 918 (S.D.Ohio 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mayo v. Cty. of Albany*, 357 F. App'x 339 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Mercado v. City of New York*, No. 8 CIV. 2855 BSJ HP, 2011 WL 6057839
(S.D.N.Y. Dec. 5, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Monell v. Department of Social Services,* 436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . 19

*Olson v. Layton Hills Mall,* 312 F.3d 1304 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . 21

*Phillips v. Mitchell*, No. 919CV0383TJMTWD, 2021 WL 1175051(TJM/TWD)
(N.D.N.Y. Mar. 29, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*Russo v. City of Cincinnati,* 953 F.2d 1036 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 21

*Smith v. Wade*, 461 U.S. 30 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Troutman v. Louisville Metro Department of Corrections*, 979 F.3d 472
(4th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17

*Turney v. Waterbury*, 375 F. 3d 756 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Wilson v. Aquino*, 233 F. App'x 73, 77 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Yousef v. Cty. of Westchester,* No. 19-CV-1737 (CS), 2020 WL 2037177
(S.D.N.Y. Apr. 28, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

## Statement of facts[1]

**1.     Leombruno threatens suicide in phone calls with his daughter.**

At 7 pm on April 12, 2018 David Douglas, Decedent Matthew Leombruno's brother-in-law called the Greene County Jail ("the Jail"), and reached Officer Ashley Proper, the control room officer (Ex. 2 p. 2)[2]. (Proper was deposed under her married name, Acker, which will be the name used in the rest of this Memorandum). Acker connected Douglas to Defendant Sergeant Christopher Statham, who was Supervisor from 3 pm to 11 pm (Statham Decl. ¶11). Douglas introduced himself to Statham as a retired New York State Corrections Captain (Ex. 7 p. 2-3). Douglas told Statham that Leombruno had telephoned his daughter [Rebecca] twice that night, and suggested in his calls that he might attempt suicide or that he wanted to kill himself (Ex. 7 p. 2-3).[3] Statham believed Douglas was credible and not exaggerating. (Ex. 25, p. 19-20). He recognized that Douglas's call identified mental health issues and the possibility of suicide (Ex. 25, p. 13, 17-18).

In response to this warning, Statham asked Acker to review the two calls Leombruno made that day, at 4:00 and 6:05 pm (Ex. L). She searched the phone system to locate the calls (Statham Decl. ¶13). They showed that Leombruno had dialed his daughter 11 times from 3:14 pm through 4 pm, when he first reached her (Ex. 13; Ex. 5, p. 1 ¶6). He dialed five

---

[1] In response to Defendants' summary judgment motion the facts are recited as most favorable to Plaintiff. Because Plaintiff is cross-moving for summary judgment, disputed facts are identified by footnote.

[2] References to deposition pages are to the page of the exhibit.

[3] Statham testified that he did not recall what rank officer Douglas said he was, and did not recall the word "suicide" coming up in the conversation. All Statham could describe of the call was that Douglas had received information from Rebecca "in regard to concerns that they had" about what Leombruno said in his calls with Rebecca (Ex. 25, p.15). Statham told a NYS Commission on Corrections investigation that he could not recall exactly what the caller said (Ex. 5, p. 6 ¶15).

more times before he reached his daughter for the second call (Ex. 13). Acker retrieved and listened to the two calls. She was "concerned" about them, and told Statham about the content of the calls (Ex. 5, p. 1 ¶6).[4] According to Correction Officer Jenna Schlenker, the officer who discovered Leombruno's body, in a conversation with Acker soon after Leombruno killed himself, Acker told Schlenker that it was clear to Acker from the phone calls that Leombruno was going to kill himself (Ex. 20, p. 4-7).[5]

Statham listened to the calls after Acker did (Ex. 1). In the 4 pm call Leombruno told his daughter to clean out the bank account and hold on to the money for the kids, make sure her brothers and sisters are "for good" and to ask Leombruno's sister [Danielle] to take care of his children (Ex. 3, 2:10-17; 5:4).[6]

He worries that he will lose his kids (Ex. 3, 2:4-7). Throughout the calls he repeats expressions like "I can't do it;" "I'm not staying here;" "I'm not going to be all right;" "I'm getting out of here one way or another;" "I'm stuck here, it's not gonna be good" (Ex. 3, 2:3, 13; 3:18, 20, 22; 4:14). At one point he says, "It's not going to work out because if I'm sitting in here for 45 days  it's not going to happen. I'm not doing it.  It's impossible. My back is killing me. I can't do it, I can't. I can't breathe,  I can't fucking feel my back, my leg.  I can't do it, I can't do it. So I'm not  gonna sit here" (Ex. 3, 5:11-15).

Rebecca is clearly extremely upset during the 4 pm call, she shrieks or is near crying, and alternates trying to reassure her father and telling him, "you're scaring me; please don't

---

[4] Acker testified at her deposition that she did not say anything to Statham about the content of the calls (Ex. 2, p. 6).

[5] In an affidavit Acker provided after Schlenker's deposition she denied making this statement to Schlenker.

[6] References to the transcripts of the Leombruno-Rebecca calls are cited "Page:Line."

do this shit. Please;" "I am worried because you're scaring the shit out of me;" "You're fucking scaring me, Dad" (Ex. 3, 2:12-14; 5:3; 5:22). At the end of this call she tells her father, "You can't be so selfish," and he responds, "Well, it is what it is. I guess I'm selfish then. I can't do it. I'll call you later." (Ex. 3, 5:18-19).

In the second call, Leombruno again complains about his pain to his bad back, which is "driving me fucking nuts" (Ex. 4, 7:2). He tells her he gave his commissary away (Ex. 4, 7:7-9). He says this was "because I didn't think I was gonna be here." The calls gave him no reasonable expectation to be freed quickly, they were more about Rebecca's failure to arrange bail. She explains her failed efforts to raise bail (Ex 4, 1:13-2:1), and when she tells him she is "trying to help you, it's just, you know . . ." he explains, "I know nobody really likes me" (Ex. 4, 4:17-18).

In this call Leombruno again repeatedly tells his daughter he is not going to last in jail, *e.g.,* "I'm not doing it anymore, I'm not. I'm not doing another weekend in here. I'm serious, I am dead fucking serious" (Ex. 4, 2:7-8; *see*, 2:4; 3:18-19; 4:16). Rebecca tells him that if he keeps it up she's going to call the jail, and Leombruno responds that he will just deny it anyway, and "well, I'm not sitting here another day" (Ex. 4, 4:3-16). When Rebecca asks him to stop saying these things, Leombruno says, "I'm serious. . . . I just want you to have fair warning because when you get a phone call it's gonna happen. . . . They're not gonna call anybody else, they're gonna call you" (Ex. 4, 4:6-9). Leombruno finishes by saying, "tomorrow's my last day here" (Ex. 4, 9:7). Leombruno's voice breaks at times during the calls (Ex. 5, p. 4 ¶13) and his affect alternated between agitation and despondence (Ex. L).

**2.    Statham, who is incompetent to assess suicide threats, assesses Leombruno's threats as not serious.**

Statham acknowledged that Leombruno was clearly upset on the calls, very frustrated with his situation, and very angry (Ex. 25, p. 14, 21), and was making threats of suicide, albeit "veiled" (Statham Decl. ¶13). But, relying on the "limited information he had" Statham chose to believe that these threats were to manipulate his daughter into bailing him out (Statham Decl. ¶15). Statham recognized that Leombruno's comments "had a threatening tone," but he surmised that they were an attempt to motivate or manipulate his daughter to do more (Statham Decl. ¶16).

After listening to the calls Statham took no step to reduce the risk of harm to Leombruno, but instead continued assessing that risk, reviewing Leombruno's seven-day earlier classification records (Ex. 1, p. 2). Leombruno had scored three points on his suicide screening, for having recently lost his job, being worried about his children, and prior drug related charges (Ex. J p. 5). Statham did nothing further except to fax a mental health referral for review by mental health staff the following morning, stating in it that Leombruno "seemed very upset with situation" (Ex. K). He did nothing to avoid an attempt at self-harm before the next day. Statham completed his tour at 11 pm, and went home and went to sleep (Statham Decl. ¶20). Leombruno was found hanging from a sheet at about 11:30 pm, and died the next day (Ex. 5, p. 8 ¶¶18, 22).

The day after Leombruno hung himself, Statham explained his actions in a memorandum to the jail Superintendant, Michael Spitz (Ex. 1). Because of "several indicators," he wrote, "it did not seem to me that [Leombruno] was going to harm himself or that the mental health worker needed to be consulted." Those indicators: (1) Leombruno never used the specific words"'kill himself;'" (2) Leombruno stated that he wanted to be

bailed out at a future time and indicated what might be done to get him out of jail in the future; Statham did not mention the indications that efforts to raise bail appeared futile or Leombruno's desperation about ever being bailed out (Ex.4, 5:11-21); (3) Leombruno "claimed to have a visit set up for later in the day" with the caller and Leombruno's child;[7] (4) There was no indication in Leombruno's records of any previous suicide attempt; (5) the mental health screening cleared Leombruno for general population and one line indicated that Leombruno looked forward to returning to his children and normal life. These "indicators" made Statham "feel" like there was no risk, although Statham did "feel" that Leombruno was upset about being incarcerated, and "felt" that his seeing mental health in the morning was sufficient (Ex. 1).

Statham relied on his feelings about suicide indicators, even though he had never received any training about behaviors that could show a potential risk of suicide (Ex.25, p. 4), had not received adequate suicide training (Ex.25, p. 20), didn't feel trained to determine the mental health status of an inmate (Ex.25, p. 29), and did not feel that he could assess suicide (Ex.25, p. 2-3). He relied instead on his "working knowledge of the jail" (Ex.25, p. 4-5). Statham confirmed in his declaration submitted in support of his summary judgment motion that he had received no training in suicide assessment, and added that he was in fact trained "not to make or attempt to make clinical, medical or mental health judgments as a Corrections Officer. I was taught that my role as a Corrections Officer was to refer these matters to medical and mental health providers" (Statham Decl. ¶6).

---

[7] Actually, Leombruno only requested to Rebecca that she visit and and bring Damian. She seemed not to have known about a planned visit before Leombruno mentioned it (Ex. 4, 2:2-8). Leombruno's visitor log showed a number of "no-show" visits, and no visits since April 10 (Ex. 26). The visiting procedure is not explained but from these facts it appears that the prisoner has to arrange a visiting time with the Jail and only then ask the family member to come.

A mental health provider from Greene County Mental Health Center was on call 24 hours a day (Ex.25, p. 24; Ex. 18 p. 1). Under the contract between the Jail and the Greene County Mental Health Center, the on-call mental health worker must honor a request for a face to face mental health evaluation of a Jail inmate (Ex. 19, p. 2). On April 12, 2018 there was sufficient staff at the Jail to assign an officer to a one-on-one watch while waiting for a mental health assessment (Ex.25, p. 23).

The Jail's written Suicide Watch Policy and Procedure ("Suicide Policy") alerts Officers that "an inmate should be placed on SUICIDE WATCH if there is *any* indication that there a danger to themselves or others. It is better to place an inmate on SUICIDE WATCH and be wrong and not place [illeg.] on the watch and the inmate commits suicide" (Ex. 18, p. 9, all-caps in original, emph. added). The shift supervisor [Statham] should notify the mental health member in case an inmate needs to be put on suicide watch, and if mental health is not contacted the inmate should first be placed on suicide watch. An inmate should be placed on one on one constant suicide watch if "the inmate has recently attempted or verbalized suicidal intent, *or a family member communicates* their knowledge of such intent." (Ex. 18, p. 9, emph. added).

**3.    The NYS Commission of Correction finds that Statham failed to recognize a serious suicide threat and failed to take proper precautions**.

In accordance with its authority under NY Correction Law § 47, the NYS Commission of Correction ("Commission") investigated, reviewed, and reported on the cause and circumstances surrounding the death of Matthew Leombruno (Ex. 5, p. 1). The Commission found that staff at the Jail "both failed to recognize a serious suicidal ideation despite being provided information that indicated such, and failed to take proper safety

precautions, including placing them on constant supervision which could have prevented his death" (Ex. 5, p. 1 ¶1).

The Commission determined that Statham violated several portions of the Greene County Jail mental health policy, including failing to identify the inmate risk factors which were listed in the policy and failing to place Leombruno on a constant watch following several statements of suicidal intent (Ex. 5, p. 5 ¶15). The Commission further found that Statham failed to keep Leombruno safe by failing to communicate to the relieving sergeant "pertinent information regarding an inmate at risk for suicide" (Ex. 5, p. 6 ¶17). Statham did not tell anybody on the next shift about the calls (Ex. 24, p. 8). The Commission directed the Jail to review and revise its mental health policy to assure that it was in compliance with current standards for mental health care and corrections, including guidelines for placing inmates on constant watch and a plan for training jail employees. (Ex. 5, p. 7 ¶1).

**4.      Greene County charges Statham with incompetence.**

The Greene County Sheriff charged Statham with Incompetence/Misconduct for failing to exercise sound judgment or rational observation, because, among other things, after he listened to the call from a family member or friend of Leombruno which indicated worries that Leombruno may be suicidal, and to phone calls between Leombruno and his daughter, and despite the clear language used by Leombruno and the the reaction of his daughter, Statham did not appreciate the risk that Leombruno was going to harm himself or that the on-call mental health worker needed to be notified for an immediate evaluation. (Ex. 24, p. 1-2). The disciplinary charges were settled with a stipulation of settlement in

which Statham accepted a loss of pay and demotion from sergeant to corrections officer for 90 days (Ex. 24, p. 5-8).

**5.      A prison suicide expert finds that Statham failed to recognize and respond to basic suicide prevention concepts.**

Dr. James L Knoll, IV, a psychiatrist, reviewed much of the information involved in this case (Ex. 15, p. 2 ¶10). Dr. Knoll has held several States' Corrections positions with significnt authority, including over suicide risk assessment and prevention (Ex. 15, p. 1 ¶¶3, 4). He is now Clinical Director of the Central New York Psychiatric Center, and responsible for suicide risk assessment and suicide prevention for prison and jail inmates in New York (Ex. 15, p. 1-2 ¶5). His resume lists 13 pages of presentations on forensic psychiatry, 36 peer-reviewed publications, and numerous articles and book chapters (Ex. 16, p. 12-41).

Dr. Knoll identified in the record several stressors or indicators of Leombruno's possible suicide, including his worries about his children (Ex. 14, p. 3), the chronic back pain Leombruno suffered (Ex. 14, p. 5-6), giving away his commissary (Ex. 14, p. 6, 20-21), his concern he would not be bailed out of jail (R40), and the many statements in the phone calls that this was his last day and he could not and would not do another day (Ex. 15, p. ¶17(a), Ex. 14 p. 10-12).

Dr. Knoll opined that Statham "failed to recognize and respond to basic, crucial suicide prevention concepts taught annually to correctional officers across the country" (Ex. 15, p. 9 ¶36). Leombruno spoke "in such a way that he was considering suicide" (Ex. 14, p. 15), and he should have had a risk assessment "as soon as possible" on April 12 (Ex. 14, p. 8, 19). He should, "with no questions asked," have been put on "suicide watch until he had a full proper mental health evaluation" (Ex. 14, p. 23-30, Ex. 15, p. 8 ¶27).

Dr. Knoll rejected the suggestion that Leombruno's expressions in the call were merely an attempted manipulation, and explained that it "requires a well-trained mental health professional" to distinguish "true from manipulated suicidality," and even then it is very hard to determine and "both can occur at the same time" (Ex. 14, p. 10-11).

Dr. Knoll found that Statham's April 13 Memorandum showed his poor understanding of possible suicide indicators, including that he was looking for a more "grave" indication of concern than protocols require (Ex. 15, p. 10 ¶36(c); Ex. 14, p. 13-14). Dr. Knoll faulted Statham's reliance on the score on the suicide screening tool, because "screening tools are not intended to set a permanent marker of suicide risk, due to the fluid nature of suicidality" (Ex. 15, p. 8-9 ¶32).

**6.      Officers at the Jail received no suicide training or refreshers and were ignorant of the Suicide Policy.**

Statham had never seen, reviewed, referred to, or been trained in the Jail's Suicide Policy or mental health policies (Ex. 25, p. 6-12). Schlenker did not recognize the written Suicide Policy, she could only assume she read it if it was in the policy binder in the control room that she was instructed to look through duing her first two weeks training (Ex. 20, p. 2-4). Acker thought it looked familiar, imagined that she would have seen it when she was hired in 2014, but has not seen it since (Ex. 1, p. 3-5).

In July 2017 the Jail's correction officers union filed a grievance that complained about the Jail's lack of training regarding mental health and suicide and stated, "suicide is a serious and frequent issue for those whom are incarcerated." (Ex. 11, p. 1-2; Ex. 23, p. 23-25).

Spitz responded to the demand "that special training regarding mental health inmates should be required for all employees and provided by the department" by sending

two employees to DCJS certified mental health training so they could develop a lesson plan to set up training for staff. (Ex. 12, p. 1). But the staff members never set up a lesson plan. Spitz's repeated inquiries about the status of the lesson plan were put off with statements that they would get to it, and Spitz left it at that (Ex. 23, p. 25-29). In any case, no training was provided to Jail employees in suicide prevention or avoidance of self-harm (Ex. 23, p. 4-7, 9-10).

Spitz himself had had no suicide training since the early 1990's (Ex. 23, p. 8). He was quite sure that most officers at the Jail would have responded to the phone calls the same as Statham (Ex. 25, p. 25-26). He believed that Statham's responding to Douglas's phone call by conducting his own investigation and reaching his own conclusions about whether there was a risk comported with the Suicide Policy, although "he could have taken more steps" (Ex. 23, p. 14-21). The County Sheriff, Gregory Seeley, explicitly stated that Statham violated no policy (Ex. 21, p. 2-4).

## Argument

## I.   Statham violated Leombruno's due process right to protection from self-harm.

### A.   The legal standard for deliberate indifference to a risk of a detainee's suicide.

Among the due process rights jail detainees have under the Fourteenth Amendment is the right to care and protection, including protection from suicide or self-harm. *Kelsey v. City of New York*, 306 F. App'x 700, 702 (2d Cir. 2009). The analyis of the right to protection from self-harm parallels that used for the right to adequate provision of medical

care, *Bell v. Gillani*, No. 9:10-CV-1577 LEK/TWD, 2013 WL 5304188, at *10 n. 14 (N.D.N.Y. Sept. 19, 2013) and this Memorandum will refer to both suicide and medical care cases without distinction. The standard used is one of "deliberate indifference." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

Before 2017 the Second Circuit applied to pre-trial detainees the same deliberate indifference test used for convicted prisoners. *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) , overruled by *Darnell v. Piniero*, 849 F.3d 17, 29 (2d Cir. 2017). A convicted prisoner "must establish both that a substantial risk to his safety actually existed and that the offending [defendant] knew of and consciously disregarded that risk." *Phillips v. Mitchell*, No. 919CV0383TJMTWD, 2021 WL 1175051 (TJM/TWD) at *4 (N.D.N.Y. Mar. 29, 2021). The risk must be sufficiently serious and the official must have a sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). As to the risk, "sufficiently serious," means that "a condition of urgency, one that may produce death, degeneration, or extreme pain" exists. *Hathaway v. Coughlin, supra* at 553. Obviously the possible self-harm to a prisoner showing suicidal tendencies presents a sufficiently serious risk. *See, Troutman v. Louisville Metro Department of Corrections*, 979 F.3d 472, 482-83 (4th Cir. 2020).

As to the official's state of mind, in *Darnell* the Second Circuit overruled *Caiozzo* and defined a less stringent culpability standard for claims by pretrial detainees. *Darnell*, at 29. The holding in *Darnell* followed from *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), where the Supreme Court defined the deliberate indifference standard under the Fourteenth Amendment for pretrial detainees allegedly subjected to an excessive use of force by a jail official: the prisoner "must show only that the force purposely or knowingly

11

used against him was objectively unreasonable." *Id.* at 396-97. In a case involving pre-trial custody, the official need not appreciate the risk to the prisoner, the standard is met if the defendant-official merely knew, or should have known, that the condition posed an excessive risk to health or safety. *Darnell,* 849 F.3d at 35. And the official is liable if he "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee*." Id.*

## B.     Statham failed to meet the standard on all fronts.

In suicide cases, there are two "broad fact scenarios" that amount to deliberate indifference: in one, the officers could fail to discover an individual's suicidal tendencies; in the other, the officers could discover and be aware of the suicidal tendencies and be deliberately indifferent in their response to the recognized risk of suicide. *Kelsey v. City of New York*, No. 03CV5978(JFB)(KAM), 2006 WL 3725543, at *5 (E.D.N.Y. Dec. 18, 2006), aff'd, 306 F. App'x 700 (2d Cir. 2009). Defendants here are liable on both grounds.

As to the first scenario, it is incomprehensible that an officer could have received Douglas's warning and reviewed the telephone calls and not have in mind that there was the serious risk that Leombruno would commit suicide. Statham admittedly did have threats of suicide in mind, as acknowledged by him in his April 13 Memo, deposition, and Declaration; he failed to prevent the suicide simply because he decided to believe that the threats were not serious or imminent. This evidence is undisputed. The obviousness of the risk is confirmed by the Commission on Corrections report, the disciplinary charge that sought Statham's dismissal from employment, and Dr. Knoll's expert opinion.

As to the second scenario, where the officer is deliberately indifferent in response to the obvious risk, it is uncontested that Statham responded to the risk by doing absolutely nothing that would decrease the risk of suicide any time before the next day. Reviewing the phone calls and Leombruno's mental health screening and classification form did nothing to decrease the risk of Leombruno's self-harm, and indeed could be said to increase it because Statham, in his known incompetence to evaluate a suicide risk, misread the "indicators," inducing him to continue to take no action.

**C.      Defendants' arguments and case law are inapposite.**

Point IA of Statham's memorandum ignores Statham's knowledge and inaction, and instead claims that he wins summary judgment based on a claim that in prisoner-suicide cases the risk of suicide must be the result of a "pre-existing mental health disorder." Statham Memorandum of Law ("Statham Memo."), pps. 6-8. Statham claims support for this supposed black letter rule of law with a single case, *Lara-Grimaldi v. Cty. of Putnam*, No. 17-CV-622 (KMK), 2018 WL 1626348 at *1 (S.D.N.Y. Mar. 29, 2018).

 *Lara-Grimaldi* quotes the phrase "pre-existing mental health disorder" from *Case v. Anderson*, No. 16 CIV. 983 (NSR), 2017 WL 3701863, at *8 (S.D.N.Y. Aug. 25, 2017). As to this phrase *Case* and *Lara-Grimaldi* cite to *Kelsey v. City of New York,* 306 F. App'x at 702. But *Kelsey* never discussed any requirement or even concept that there be a pre-existing mental disorder. The facts in *Kelsey* include no mention of decedent suffering a previous mental disorder, as is made clear from the district court opinion. *Kelsey v. City of New York*, 2006 WL 3725543, at *1–3. Decedent's mental disorder manifested on the day of his "suicide by cop." *Id.* at *2, *5. The Court of Appeals simply reaffirmed the long-

standing principle that a pretrial detainee has a substantive due process right to protection from self-harm – and made no mention of prior mental health history. *Kelsey,* 306 F. App'x at 702.

The actual holdings of *Lara-Grimaldi* and *Case* also had nothing to do with whether decedent's mental disorder pre-existed or only manifested itself in the wish to commit suicide, and the use in both cases of the phrase "pre-existing mental health disorder" is at best *dicta*. We have found no case in any jurisdiction that requires a plaintiff to have a pre-existing mental disorder to have the right to protection from self-harm; many cases do not. *E.g., Kelsey, Phillips v. Mitchell, supra*, 2021 WL 1175051 *4; *Yousef v. Cty. of Westchester,* No. 19-CV-1737 (CS), 2020 WL 2037177, at *6 (S.D.N.Y. Apr. 28, 2020). *Bell,* 2013 WL 5304188 at *10 n. 14.

Statham's Point IB purports to show that he was as diligent as the defendants in four cases brought against medical providers, only one of which uses the *Darnell* standard of deliberate indifference. Statham Memo., p. 8-12. He equates his feckless attempt to evaluate suicide signifiers with the considered medical judgment of those providers.

*Mayo v. Cty. of Albany*, 357 F. App'x 339 (2d Cir. 2009) was brought pre-*Darnell*, and required proof of "deliberate[] disregard[] of the harm a result[ing from] his actions . . . the equivalent of criminal recklessness." *Id.* at 341. Under any standard, by contrast with Statham's amateur conclusions, the court found that each time decedent was evaluated, the medical personnel "came to an *informed* conclusion that, despite some contraindications, decedent was stable enough not to pose a suicide risk." *Id.* at 341-42 (emph. added).

*Fontaine v. Cornwall*, No. 9:15-CV-432(DNH), 2019 WL 4257136 (N.D.N.Y. Sept. 9, 2019), was decided under the Eighth Amendment standard, and the court found that

none of the defendant's met that subjective standard. They also all acted more professionally than Statham. Defendant psychiatrist examined plaintiff, prescribed an anti-depressant, and requested a follow-up for a time after the antidepressant would take effect. *Id.* at *2. Defendant social worker examined plaintiff twice and discounted his mention of frequent thoughts of suicide because he smiled and said he wouldn't do it and did not seem depressed, presented as smug rather than in distress, and the suicidal ideations could be symptoms of his antisocial personality disorder. *Id.* at *2-3. Defendant nurse practitioner treated plaintiff's physical injury with the muscle relaxers with which plaintiff tried to killed himself. The nurse did not have access to plaintiff's mental health records and plaintiff said nothing about suicide. *Id.* at *3. The court concluded that the psychiatrist believed there was a low risk of suicide and had a legitimate reason to delay the next examination. *Id.* at *6. Plaintiff expressly said to the social worker that he "wouldn't kill himself" and appeared to be just seeking attention, the social worker expressly inferred that he presented no risk of suicidality, and plaintiff failed to establish the social worker's *subjective* awareness that plaintiff was an active suicide risk. *Id.* at *6-7. There was no "triggering event" that would have given the nurse practitioner notice of plaintiff's intention to commit suicide; he did not notify anyone of that intent within 48 hours of the attempt. Plaintiff did not establish the nurse's "subjective awareness" that plaintiff was at risk. *Id.* at *7. Nothing in *Fontaine* is comparable to the facts in the present case.

Also in *Mercado v. City of New York*, No. 8 CIV. 2855 BSJ HP, 2011 WL 6057839 (S.D.N.Y. Dec. 5, 2011) plaintiff was required to show that the officer was actually aware of the immediate danger, and acted with criminal recklessness. *Id.* at *4. In this case decedent was evaluated by a clinician for over an hour with no indication that he would harm

himself. *Id.* at *4. The only "lapse" was that defendants did not obtain a supervisor's review of the evaluation that he was not suicidal. "That the clinician might have ultimately been wrong in his *professional* judgment does not support a showing of deliberate indifference." *Id.* at *5, (emph. added).

*Yousef* is the one case Defendant cites that uses the post-*Darnell* objective standard of deliberate indifference. It was brought only against the county and John Doe defendants, and on the motion to dismiss plaintiff failed to identify a single allegation against a specific defendant. *Id.* at *7. Here also medical professional made considered judgments. They also placed decedent on constant supervision for two days, until on subsequent examination they determined he was not suicidal and could be returned to general population. *Id.* at *2. Had Statham merely done the same, including obtaining a professional judgment, we would not be here.

In each of those cases plaintiffs at best challenged the medical judgment of mental health professionals who conducted examinations or interviews of the prisoner that in their medical judgment were sufficient, and concluded based on their medical judgment that there was no risk of suicide. The courts in all these cases found that even if the health workers' assessments of the prisoners' mental health and risk of suicide were flawed, the health workers had sincerely tried to make a proper evaluation of the prisoner's mental condition, and thus were not indifferent to the risk of suicide.

What Statham has failed to present is a single case in which non-medical personnel, after possible threats by a prisoner of self-harm, including a warning by a family member and multiple threats in telephone calls, took it upon themselves to evaluate the risk of self-harm, weigh possible "indicators" of suicide, and discount the threats, to arrive at their own

16

final determination without ever consulting a medical provider or even a supervisor. And there is certainly no such case where the officer did this when the officer was himself aware that he had no training and no ability to identify a risk of self-harm, and had been taught not to try to make this assessment.

### D.    Statham's summary judgment motion on the §1983 claim should be denied and Plaintiff's should be granted.

There is no need to evaluate whether Statham's actions to protect Leombruno against self-harm were reasonable, because he took no protective action. If no protective action is taken, the only issue is whether Statham "actually heard a threat requiring action." *Longmire v. McCoole*, No. 2:16CV653, 2017 WL 5931430, at *7 (E.D. Va. Nov. 30, 2017). Statham admits he heard a threat contemplating suicide. In *Longmire* the court denied Defendant Smallwood's motion for summary judgment where Smallwood's only indication that decedent was suicidal was the disputed fact that Smallwood was near decedent's cell when decedent loudly yelled, "I feel like I'm going for going nuts, I feel like I'm going to fucking hurt myself." *Id.* at *4.

Having a description of a threat of harm in a call from a family member alone should be enough, even if not cumulated by hearing the recorded calls themselves that contain the actual threats of self-harm. "Custodians have been found to 'know' of a particular vulnerability to suicide when they have had actual knowledge of an obviously serious suicide threat." *Colburn v. Upper Darby Tp.*, 946 F.2d 1017, 1025 at n. 1 (3d Cir. 1991). Other cases have relied on a suicide threat as by itself a trigger to take some action to protect against the suicide. *Troutman, supra*, 979 F.3d at 483 ("evidence that the inmate . . . recently expressed a desire to self-harm"); *Conn v. City of Reno*, 591 F.3d 1081, 1102 (9th

Cir. 2010), *cert. granted,* judgment vacated *sub nom.* City of Reno, Nev. v. Conn, 563 U.S. 915 (2011), and opinion reinstated, 658 F.3d 897 (9th Cir. 2011)("When a detainee attempts *or threatens* suicide en route to jail, it is obvious that the transporting officers must report the incident to those who will next be responsible for her custody and safety")(emph. added); *Turney v. Waterbury*, 375 F. 3d 756 (8th Cir. 2004)(prisoner was going to "hang it up"); *Smith v. Brevard Cty.*, 461 F. Supp. 1243, 1248 (M.D. Fla. 2006)(family told jailor that prisoner had threatened suicide); *Greason v. Kemp*, 891 F.2d 829, 835–36 (11th Cir. 1990)(Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, *or even threatened*, suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference")(emph. added); *Matje v. Leis*, 571 F.Supp. 918 (S.D.Ohio 1983)(inmate's attorney told jail officials that inmate would attempt suicide by smuggling in drugs behind her diaphragm, and body cavity search was not performed).

Given the evidence from Schlenker that Statham did believe that Leombruno would commit suicide, Statham's summary judgment motion is without foundation. But even were we to take the undisputed facts in the light most favorable to Statham, his liability remains clear. The statements that he admittedly heard about Leombruno getting out of jail "one way or another," "not staying another day," and so on, raised the spectre of suicide. Statham acknowledged that they were "threats;" not being threats to anyone else they could only have been threats to himself. The best that can be said for Statham's inaction is that he guessed. Statham's relying on uninformed guessing in the face of a prisoner's possible death is nothing but deliberate indifference to a serious risk.

18

Statham's alternative is that he relied on Leombruno's suggestions that he would not kill himself until the next day or after the weekend. But Statham knew that he was not competent to tell how long a person threatening suicide in the future could hold on, or that he would not at any moment decide that now was the time to end his life. And Statham left a person who was in pain, very angry, very upset, and talking about soon committing suicide, to suffer alone in a jail cell, at best to suffer a dark night of the soul contemplating whether it was worth it to stay alive. A reasonable person could and would not assume that Leombruno was safe until the morning, or whatever later time a mental health worker would arrive in response to the fax that Leombruno "seemed very upset with the situation." Statham was as a matter of law deliberately indifferent to the risk of suicide, and summary judgment should be granted to Plaintiff.

## II.     The County's suicide policy and lack of training caused Leombruno's suicide and the County is liable under 42 U.S.C. §1983.

*Monell v. Department of Social Services,* 436 U.S. 658, 690 (1978), held that a local government unit could be liable under § 1983 for a constitutional violation if it resulted from a municipal policy. A failure to train is such a policy if the failure shows "deliberate indifference to the rights" of those with whom the employees will interact, and there is liability if the inaction caused the wrongdoing to occur. *City of Canton v. Harris,* 489 U.S. 378, 388-89 (1989).

Under New York law, Sheriff Seeley is the final policymaker for the Jail. *See, Hill v. Cty. of Montgomery,* No. 914CV00933(BKS/DJS), 2019 WL 5842822, at *18 (N.D.N.Y. Nov. 7, 2019). He created the Jail's policies in conjunction with Superintendent Spitz, who

was chief administrative officer of the Jail (Ex. 21, p. 5-7; Ex. 23, p. 2-3). Sheriff Seeley explicitly testified that what Statham did on April 12 "did not violate the policies of precedures applicable to his employment;" (Ex. 21, p. 2-4). Spitz testified that Statham didn't follow the Suicide Policy completely, and went on to explained that despite the direction to place a prisoner on constant watch "if a family member communicates their knowledge of [suicidal] intent," Jail policy allowed Statham to review the phone calls after receiving Douglas's call and make a "judgment decision" on what to do (Ex. 23, p. 16, 20). "The person in charge has to make the decision and use their judgment, and . . . He actually reviewed prior intakes which to me is a step or two more than what a lot of them would've done, but because we know what happened he probably used a little bit of poor judgment and didn't take the next step" (Ex. 23, p. 21; see, generally p. 15-21). This testimony confirms that County policy allowed this unqualified person to make a judgment call on whether a constellation of indications amounted to a real suicide threat or something manipulative and not immediately pressing. This is sufficient to hold the County liable.

The County is also liable because of the failure to train the Jail's officers in suicide prevention. Municipal inaction, like a failure to train, is a municipal policy if the inaction shows "deliberate indifference to the rights" of those with whom the employees will interact, and there is liability if the inaction caused the wrongdoing to occur. Deliberate indifference will be found where the nature of the employees' duties or a previous pattern of violations makes it obvious that, without further action, the employees are highly likely to violate citizens' federally protected rights. *City of Canton,* 489 U.S. at 390.

Muncipal deliberate indifference may be established where "the need for more or better supervision to protect against constitutional violations was obvious . . . but the

20

policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs."
*Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). The need to protect against
violations can be found where employees are likely to confront a difficult problem and a
particular policy was necessary for them to correctly solve the problem. *Olson v. Layton
Hills Mall,* 312 F.3d 1304, 1319 (10th Cir. 2002) (jail prebooking officers not trained to deal
with detainees with obsessive-compulsive disorder); *Russo v. City of Cincinnati,* 953 F.2d
1036, 1047 (6th Cir. 1992)(inadequate training of police officers to deal with mentally
disturbed individuals).

Dealing with possible suicide is one such difficult problem for jails. It has long been
well-known that suicide is a prevalent problem and therefore of concern in United States
prisons and jails. FRANK, LAURA AND AGUIRRE, REGINA T. P. (2013) "Suicide Within United
States Jails: A Qualitative Interpretive Meta-synthesis," The Journal of Sociology & Social
Welfare: Vol. 40 : Iss. 3, Article 3, at page 31.[8] Suicides in jails have been recognized as a
critical problem even longer than in jails, because the number of jail suicides far exceed the
number of prison suicides. DOJ National Institute of Corrections, "Prison Suicide: An
Overview and Guide to Prevention," June, 1995.[9] Greene County has direct experience.
Spitz was aware of two suicide attempts in the Jail, and was unable to list all the attempts at
self-harm (Ex. 23, p. 11-13). He received a direct communication from his officers
complaining about the need for and lack of suicide training. Spitz acknowledged that there

---

[8]  Available at: https://scholarworks.wmich.edu/jssw/vol40/iss3/3.

[9]  available at https://nicic.gov/prison-suicide-overview-and-guide-prevention.

is a need for suicide training because he initiated development of a training program, but then showed deliberate indifference to the need by failing to follow through.

None of the officers deposed in this case had any familiarity with the Suicide Policy, not having seen it since their initial employment at the jail, at best. There was no follow-up discussion of suicide risk or practices. Simply regularly directing their attention to the Suicide Policy and the obligation to follow it could have prevent this suicide. The total lack of training at the Jail caused the outcome here, and the County can be held liable.

## III.   Because Statham took no action to protect Leombruno in the face of a clear warning of a serious risk of self-harm, he is not entitled to qualified immunity.

Statham has formulated his own statement of clearly-establish law concerning detainee protection against suicide, but cites no statement from case law (Statham Mem. at 17-18). It has been long established that a prison official's deliberate indifference to a strong likelihood that a prisoner would commit suicide constitutes a constitutional violation. In this district, the first mention appears to be from over 25 years ago, in *Burke v. Warren Cty. Sheriff's Dep't*, No. 90-CV-597 (HGM), 1994 WL 675042, at *5 (N.D.N.Y. Nov. 25, 1994).

More recent cases in this circuit have defined that civil right in the specific context of qualified immunity. *Case v. Anderson*, 2017 WL 3701863, at *16, phrased the qualified immunity question as "on the particular facts of this case, in this specific context, did [the detainee] pose a 'serious risk of suicide' so that any 'reasonable,' 'competent' officer would have known that they could not be 'deliberately indifferent' to his plight, and that by failing to do more than they did to protect him from suicide … they were clearly violating his

22

constitutional rights?" *Lara-Grimaldi, supra,* 2018 WL 1626348, at *9 used a virtually identical formulation. *Kelsey v. City of New York, supra* (District Court decision), 2006 WL 3725543, at *9, expressed the qualified immunity standard most simply as "a pretrial detainee's right to be free from deliberate indifference by police officers to suicide, while in custody.

 Statham can hardly claim that clearly established law did not give him notice that he should protect against the suicide of a prisoner who has given a clear indication of a serious risk that he will try to harm himself. As a matter of law, he is not entitled to qualified immunity on the facts of this case.

## IV. Statham and the County of Greene negligently failed to protect Leombruno from the risk of suicide and are liable under state law.

 Point I of this Memorandum establishes that Statham knew or should have known of Leombruno's risk of self-harm and disposes of his contention that he was "never aware of any suicide risk." Statham appears also to claim that Leombruno's suicide was not a reasonably foreseeable consequence of his taking no action in the face of Leombruno's threats, but does not explain why not. Obviously when Statham learned that Leombruno threatened to kill himself, did nothing to prevent it when he could have, and Leombruno promptly did kill himself, the suicide is a reasonably foreseeable result of Statham's inaction. The arguments presented in Point I of this Memorandum establishing deliberate indifference *a fortiori* prove Statham's negligence and the County's liability under *respondeat superior*, and summary judgment should be awarded to Plaintiff on the negligence claim.

23

## V.   The evidence supports an award of punitive damages against Statham.

Punitive damages are available in a §1983 action when defendant's conduct involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Wilson v. Aquino*, 233 F. App'x 73, 77 (2d Cir. 2007). Similarly, in New York, punitive damages may be awarded in a negligence case for conduct so reckless as to amount to a conscious disregard of the rights of others. "It need not be intentionally harmful, but may consist of actions which constitute willful or wanton negligence or recklessness." *Home Ins. Co. v. Am. Home Prod. Corp.*, 75 N.Y.2d 196, 203-04 (1990).

As shown in Point I of this memorandum, Statham's total inaction in the face of the obvious and known risk that Leombruno would commit suicide was deliberate indifference and meets the standard of recklessness. And certainly that standard is met if Statham actually did believe that Leombruno would commit suicide, as the disputed facts make out. The punitive damages claim against Statham should not dismissed because a reasonable jury could find that Statham was grossly negligent in failing to recognize the risk, or actually knew that Leombruno was going to kill himself.

## VI.   Plaintiff's decedents suffered pecuniary loss and there is no failure of proof on that element of wrongful death.

Defendant County baldly asserts that Plaintiff has no proof of any pecuniary loss, and as a result cannot meet that one element of a State wrongful death claim. In discovery, Plaintiff disclosed to Defendants a bill for funeral expenses, which are available damages in a wrongful death case. *Gonzalez v. New York City Hous. Auth.*, 77 N.Y.2d 663, 668 (1991). (See Ex. 10). Plaintiff also disclosed earning records from Leombruno's most recent

employment (Ex. 8) supporting a wrongful death claim for lost earnings. *Id.* Plaintiff provided an economic expert's report, (Ex. 9) which calculated lost earnings of from $500,000 to nearly $2 million. Leombruno had adult and minor children (Ex. 17, p. 2-8; Ex. 28, p. 2-4), and there are possible claims for loss of guidance to both Leombruno's minor and adult children. *Id.*, 77 NY2d at 668-69. Defendants are not entitled to summary judgment on this claim.

## Conclusion

Statham learned of Leombruno's threats of suicide. He decided to follow his own judgment that they were not serious threats, rather than obtain a mental health consutation, even though he knew his judgment regarding assessing suicide threats was uninformed and incompetent. Therefore he was deliberately indifferent to the risk that Leombruno would follow through on his threats. This indifference resulted in Leombruno successfully committing suicide. Statham should be held liable for his decision.

Dated:     New York, NY
           April 9, 2021

Eugene B Nathanson
Attorney for Plaintiff
80 Broad Street, 5th Floor
New York, NY 10004
212-227-3241
ebnesq@eugenenathanson.us


Mark D. Greenberg, Esq.
Greenberg & Greenberg
Attorney for Plaintiff
4 East Court Street
Hudson, NY 10004
Tel: (518) 828-3336
E-Mail: markg@g2law.com