**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**ESTATE OF MATTHEW J. LEOMBRUNO, by and through its Administratrix, Danielle Douglas,**

**Plaintiff,**

**v.** **No. 9:19-cv-374 (TJM/CFH)**

**THE COUNTY OF GREENE, and SERGEANT CHRISTOPHER STATHAM,**

**Defendants.**

---

**THOMAS J. McAVOY,**
**Senior United States District Judge**

## DECISION & ORDER

Before the Court are the parties' motions for summary judgment. See dkt. #s 60, 61, 64. Also before the Court is Defendant Christopher Statham's motion to strike the Plaintiff's expert report. See # 66. The parties have briefed the issues, and the Court will decide the matter without oral argument.

## I. Background

This case arises out of the death by suicide of Matthew J. Leombruno ("Leombruno" or "Decedent"),[1] who was housed at the Greene County, New York, Jail at the relevant time.

---

[1]Defendant Statham's briefing refers to Leombruno and his daughter by their initials. While the Court understands that many lawyers have an almost insatiable desire to create abbreviations and save space, the Court would prefer that the parties refer to people by their actual names or an appropriate designation, such as "Defendant,"
(continued...)

On the night that Decedent used sheets to hang himself in his cell, one of Leombruno's relatives had called the Jail and spoken with Defendant Sergeant Christopher Statham, a guard at the Jail. Plaintiff alleges that this relative warned Statham that Decedent may harm himself, and that Statham did not take appropriate action. Decedent's estate alleges that Defendants, the County of Greene and Statham, violated Leombruno's constitutional rights and acted negligently in their supervision of Leomburno's incarceration, leading to his death.

Matthew Leombruno first underwent incarceration at the Greene County Jail from December 29, 2017 through January 8, 2018. Defendant Statham's Statement of Material Facts, dkt. # 61-2, at ¶ 1.[2] Defendant Statham did not interact with Decedent during this period. Id. at ¶ 2. During this first period, Decedent did not submit any forms requesting medical attention or mental health treatment. Id. at ¶ 3. A Greene County Jail classification record created on December 29, 2017 did not find any need for medical or mental-health housing. Id. at ¶ 5. That classification, signed by Decedent and a jail officer on December 29, indicated that Leombruno did not have a history of self-injury or suicide. Id. at ¶ 6. That signed form also indicated that Decedent did not have a history of "self-harmful acts and/or suicide attempts." Id. at ¶ 7. The form further indicated that medical staff saw no need for special housing related to Leombruno's mental health or medical history and concluded that

[1](...continued)
"Plaintiff," or "Decedent," when the Local Rules do not require otherwise.

[2]All parties supplied statements of material facts with citations to the record as required by the Local Rules. The Court will quote to Defendant Statham's statement for facts which are not disputed and cite to the other statements when factual disputes exist as appropriate.

Decedent had no cumulative risk for self-injury or suicide. Id. at ¶ 8.Rebecca Leombruno, Decedent's daughter, provided $500 cash bail for Decedent on January 8, 2018. Id. at ¶ 4.

Beginning on April 5, 2018, Matthew Leombruno again faced incarceration at the Greene County Jail, this time as a pre-trial detainee. Id. at ¶ 10. Decedent, along with a Jail officer, signed another classification form. Id. at ¶ 11. Like the previous form, the one signed on April 5, 2018 found that Decedent did not need mental-health or medical housing. Id. The form also indicated that Leombruno did not have a history of self-injury and/or suicide or any attempts at such conduct. Id. at ¶¶ 13, 15. The form also contained no request for any special needs housing related to Leombruno's medical or mental health history. Id. at ¶ 17. Defendant Statham reviewed the form on that day. Id. at ¶ 12.[3]

Defendant and a guard also signed a suicide-risk form. Id. at ¶ 19. That form also did not indicate that the officer who transported Decedent considered Leombruno a suicide risk, nor did the form state that any member of Decedent's family or a significant other ever attempted or died by suicide. Id. at ¶¶ 19, 21. The signed form also showed that Decedent denied any drug use prior to his intake into the Jail. Id. at ¶ 23. The form reported that Decedent did not have a history of counseling or other mental health treatment. Id. at ¶ 25. The form did not state that Decedent had expressed "extreme embarrassment, shame, or feelings of humiliation as a result of [the] charge or incarceration," nor did it "indicate that Decedent was thinking about killing himself." Id. at ¶¶ 27, 29. The suicide screening also did not state that Decedent had made any previous attempts to die by suicide, and made no attempts in the past year. Id. at ¶¶ 31, 33. The screening also reported that Decedent

[3]Statham's statement repeats that, for each type of information noted on the form, Statham reviewed the form on April 5, 2018. Plaintiff does not dispute that he did so.

looked "forward to returning to his children and his normal life." Id. at ¶ 35. The screening reported no signs of depression and no signs that Decedent "was displaying unusual behaviors or acting and/or talking in a strange manner." Id. at ¶¶ 37, 39. The screening did not indicate that Decedent seemed under the influence of drugs or alcohol, or displayed signs of withdrawl from such substances. Id. at ¶¶ 41, 43. According to the report, Decedent did not seem "incoherent, disoriented, or showing signs of mental illness." Id. at ¶ 45.

The report indicated that Decedent had a "cumulative screening report" of "3." Id. at ¶ 47. According to Defendants, a cumulative score of 5 or less did not require that an inmate be placed on suicide watch. Id. at ¶ 49. Plaintiff disputes this statement pointing out that the form does not contain such a requirement. The suicide screening report provided in the record indicates that the total "yes" answers on the form were three, and states that "[i]f the total checks in the yes column are 8 or more, or if you feel it necessary, notify the supervisor." See Plaintiff's Response to Defendant's Statement of Material Facts ("Plaintiff's Response"), dt. # 64-30, at ¶ 49. Officer Marchi, who completed the report with Leombruno, did not find a need to place Decedent on "constant supervision." Defendant's Statement at ¶ 50. The screening report likewise did not find that "Decedent possessed a potential for self-injury or suicide." Id. at ¶ 52.

Plaintiff Danielle Douglas, Decedent's sister, did not contact Defendant Statham during Leombruno's incarceration. Id. at ¶ 54. Decedent's daughter Rebecca also never directly communicated any concerns she had about her father to Statham or anyone else at the Jail. Id. at ¶ 55. Plaintiff argues that she and Rebecca, her niece, communicated through her husband, David Douglas, who called the jail. Plaintiff's Response at ¶¶ 54-55.

Decedent spoke to Rebecca Leombruno 18 times while he was in the Jail between April 5, 2018 and April 12, 2018. Id. at ¶ 57. Defendant Statham claims he was unaware that any calls between Decedent and Rebecca Leombruno had occurred before April 12, 2018 at the end of his shift on April 12, 2018. Id. at ¶ 58. Plaintiff points out that a list of the eighteen calls Decedent made while incarcerated all went to the same number, the same number as the two calls Decedent made on April 12, 2018. Plaintiff's Response at ¶¶ 57-58.

Between 7:00 p.m. and 7:30 p.m. on April 12, 2018, Defendant Statham became aware that Decedent spoke twice to his daughter Rebecca on that day. Defendant's Statement at ¶ 59. Sometime between 7:30 p.m. and 10:00 p.m. on that day, Statham listened to the recording of Decedent's April 12 phone call. Id. at ¶ 60. He heard the Decedent say, "[n]o, I'll just deny it." Id.

Rebecca Leombruno deposited $20.00 into her father's account for use in the commissary at the Jail between April 5, 2018 and April 12, 2018. Id. at ¶ 61. On April 12, 2018, Decedent told his daughter that "[w]ell, that's what happens, I didn't think I was gonna be here, I had all intentions on fuckin' leaving." Id. at ¶ 62. Defendants contend that this statement concerns the commissary account. Id.

The parties dispute whether Decedent had a visit with his son scheduled for April 13, 2018. Id. at ¶ 63. Citing to a recording of one Decedent's telephone calls with his daughter, Defendants claim that, "[a]s of 11:00 PM on April 12, 2018, Decedent was scheduled for a visit with Rebecca and his son on April 13, 2018." Id. Plaintiff contends that the telephone call "shows only that Leombruno requested that Rebecca bring his son for a visit." Plaintiff's Response at ¶ 63. Rebecca Leombruno visited her father in jail before April 12, 2018. Defendants' Statement, at ¶ 66.

Decedent did not submit any mental health or medical request forms during his incarceration. Id. at ¶ 65. Defendants also contend that Statham had no information to indicate that Decedent may have been suffering from opiate withdrawal during his detention. Id. at ¶ 67. They insist that Decedent did not have a drug problem before he entered the Jail. Id. at ¶ 68. Plaintiff disputes this claim by pointing out that Leombruno's death certificate pointed to "opiate dependency as a significant condition." Plaintiff's Response at ¶ 68. Still, none of Decedent's family members with whom he resided believed he had a drug problem, and none of those family members had knowledge of a drug problem for Leombruno. Defendants' Statement at ¶¶ 69-70.

Defendants further claim that Decedent had no mental health problems before his death. Id. at ¶ 71. Plaintiff disputes this claim, pointing out that, while "[t]here are no facts either way as to whether he in fact had any mental health issues, which cannot be known specifically without his having had a mental health examination," the fact that Leombruno died by suicide "is evidence that he had mental health issues before he committed suicide." Plaintiff's Response at ¶ 71. In any case, the parties agree that none of Decedent's family members thought he had mental health problems before his April 2018 incarceration, or had any personal knowledge that he suffered such issues. Defendants' Statement at ¶¶ 72-73. Danielle Douglas believed that her brother's mental health was "fine" before April 2018. Id. at ¶ 74. Danielle Douglas was not aware that her brother had received any history of mental health issues before he died. Id. at ¶ 75. She did not know if he took any medications for mental health issues before he entered Jail. Id. at ¶ 77. She had no personal knowledge that he ever saw a mental health counselor or other treatment provider. Id. at ¶ 78. David Douglas was not aware of Decedent receiving any mental health

treatment in 2014 or 2015, and had no problem with Leombruno residing in his home. Id. at ¶¶ 76, 79. He was not aware that Decedent was using any drugs at that time. Id. at ¶ 80. He did not take any steps to get Leombruno mental health treatment, nor did he suggest that other family members take such action. Id. at ¶¶ 81-82. He did not discuss such treatment with Decedent. Id. at ¶ 83.

David Douglas did not plan to visit the Jail in April 2018. Id. at ¶ 84. He had never visited Lembruno while he was incarcerated there. Id. at ¶ 85. Danielle Douglas also did not visit Decedent in jail. Id. at ¶ 86. Rebecca Leombruno visited the Decedent in jail; "she did not express any concerns to Danielle" Douglas afterwards. Id. at ¶ 87. David Douglas "had no sense that Decedent had ever been suicidal in his life." Id. at ¶ 88. He was surprised to learn that Leombruno "attempted to commit suicide on April 12, 2018." Id. at ¶ 89.

David Douglas learned of two phone calls between the Decedent and Rebecca Leombruno on April 12, 2018. Id. at ¶ 96. Douglas knew from his wife, Danielle Douglas, that Rebecca Leombruno had attempted "to find out a way to bail Decedent out, and that Decedent was not happy in jail." Id. at ¶ 95. Danielle Douglas "relayed to" her husband "the concern that Rebecca had about her telephone conversation with Decedent on April 12, 2018." Id. at ¶ 97. Though Danielle Douglas testified that she "did not know whether Decedent expressed to Rebecca that he was going to harm himself during" one of their conversations on April 12, 2018, she spoke to David Douglas after that conversation. Id. at ¶¶ 92-93. David Douglas did not contact Rebecca Leombruno to get any details about the conversations. Id. at ¶ 98. He instead called the Greene County Jail. Id. at ¶ 97. He testified that he spoke with Defendant Statham, who told him "he would listen to" recordings

of "the calls" between Decedent and Rebecca Leombruno "and if he deemed action appropriate he would take care of it or he would look into to it." Id. at ¶ 99. Douglas testified that Statham "did not say he would take any protective measures." Id. at ¶ 100. Danielle Douglas testified that she texted Rebecca Leombruno after this call to inform her that David Douglas called the jail. Id. at ¶ 101. She and David Douglas then went to sleep. Id. David Douglas did not make a follow-up call to the jail "to find out the nature of any determination reached by Statham after listening to the calls." Id. at ¶ 90.

Laura Merante, a Social Worker for Greene County, filled out a Greene County Mental Health Service Log for the Decedent on April 6, 2018. Id. at ¶¶ 102-103. Merante found "nothing significant" in the log and "cleared [Decedent] for general population." Id. at ¶ 103. Merante testified that, based on her knowledge and training and the policies in effect in April 2018, the Jail would "not necessarily" have been required to put an inmate on constant watch under circumstances where an inmate's family member called the Jail to report that the inmate had told another family of a "suicidal intent." Id. at ¶ 104. Plaintiff points out that the Jail's Suicide Watch Policy and Procedure "states that a constant one-on-one watch should be provided when 'the inmate has recently attempted to verbalize suicidal intent; or a family member communicates their knowledge of such intent.'" Plaintiff's Response at ¶ 104.

Corrections Officer Ashley Acker listened to two telephone calls between Matthew and Rebecca Leombruno on April 12, 2018. Defendant's Statement at ¶ 105. Acker does not recall that anyone in the control room, where she listened to the calls, uttered the word "suicide" or "suicidal" at any time during her tour of duty on April 12, 2018. Id. at ¶ 106. Acker remembered only that Decedent was not "happy about being in jail" and "wanted to

be bailed out" on those calls. Id. at ¶ 107. Defendants contend that Defendant had a "tone" during those calls that sounded "normal" to her when compared to that of other inmates "discussing similar matters" with their families. Id. at ¶ 108. Acker could not remember anything in particular about Rebecca Leombruno's tone. Id. Plaintiff argues that "decedent's tone" in the calls "variousy sounds anxious, depressed, hysterical, and calm, and decedent's daughter is frequently shocked and clearly upset and on the verge of tears." Plaintiff's Response at ¶ 108. Plaintiff points to deposition testimony from another Jail guard, Jenna Schlenker, who reported that Acker thought Leombruno would die by suicide after listening to his calls with Rebecca Leombruno. Id. at 108 (citing deposition testimony of Jenna Schlenker, Exh. 20 to Plaintiff's Opposition/Cross-Motion, dtk. # 64-21, at 4-7). The parties dispute whether Acker told Statham that she had concerns about Leombruno's safety after listening to the calls. Compare Defendant's Statement, at ¶ 109 and Plaintiff's Response at ¶ 109.

Defendants point to Schlenker's testimony that she spoke with the Decedent shortly after 11 p.m. on April 12, 2018. Defendant's Statement at ¶ 110. She reported that he "seemed good." Id. Leombruno told Rebecca Leombruno he "was doing well and" that "he couldn't wait to get out." Id. Schlenker stated that she "would have never guessed" that Decedent would attempt suicide. Id. Plaintiff respond that these statements are not material to the case, since there is no claim against Schlenker and no allegations that she reported her views to Statham. Plaintiff's Response at ¶ 110.

The Jail's Superintendent, Spitz, listened to the two April 12, 2018 calls and did not hear any statements from the Decedent that he took to be "red flags"; he did not "hear [Decedent] at all ever say 'I'm going to commit suicide, I'm going to kill myself,' none of that

was said." Defendant's Statement at ¶ 111. Plaintiff points out that, despite this statement, Spitz conceded that some words in the conversation "could be interpreted to suggest suicide." Plaintiff's Response at ¶ 111. Moreover, Plaintiff notes, Spitz issued a letter of reprimand to Statham after the incident in question. Id. Spitz alleged that Defendant failed "to follow protocol," which led to "serious injury/death." Id. Plaintiff characterizes the reprimand as "faulting Statham . . . for determining from the calls that there was no threat and violating policies by not communicating the threat to the tier officer, briefing the incoming sergeant, speakig with Leombruno, calling the on-call mental health worker, moving Leombruno to an area where he could be monitored, instituting active supervision for Leombruno, or contacting a supervisor for directions." Id. In any case, Spitz concluded that "Statham had 'reviewed that phone call and made a judgment decision on what he should have done at that point.'" Defendant's Statement at ¶ 112.

Statham reviewed the Greene County Mental Health Service Log for Matthew Leombruno on April 12, 2018. Id. at ¶ 113. Defendants claim that the Service Log "indicated that [Leombruno] did not pose a suicide risk or self-harm [sic]." Id. Plaintiff disputes this characterization, contending that the exhibit Defendants point to "does not mention 'suicide' or 'self-harm.'" Plaintiff's Response at ¶ 113.

Plaintiff's Amended Complaint raises four claims. Count One, brought against Statham pursuant to 42 U.S.C. ¶ 1983, alleges that Statham acted with deliberate indifference to a serious medical need, causing Leombruno's death. Count Two, also brought pursuant to 42 U.S.C. ¶ 1983, contends that Lumbruno's injuries were the result of inadequate policies and practices by Defendant County of Greene. Count Three is a state-law negligence claim, and Count Four is a wrongful-death claim. Plaintiff raises the last two

claims against all Defendants.

The parties filed motions for summary judgment at the close of discovery. Defendant Statham also filed a motion to strike the expert testimony of James L. Knoll, IV, M.D. The parties have briefed the issues, bringing the case to its present posture.

## II. Legal Standard

The parties seek summary judgment. It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or

on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

## III. Analysis

As striking Plaintiff's expert report could influence the Court's ruling on the other motions, the Court will first address that motion. The Court will then consider the parties' summary judgment motions in light of the resolution of that motion.

### A. Expert Testimony

Defendant Statham argues that the Court should not consider the expert testimony of James L. Knoll, IV, M.D., which the Plaintiff offers in support of the estate's claims. Federal Rule of Evidence 702 "governs the admissibility of expert testimony." Showers v. Pfizer, Inc., 819 F.3d 642, 658 (2d Cir. 2016). That Rule permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training or education" to "testify in the form of an opinion" under certain conditions. FED. R. EVID. 702. To be qualified to testify, the "expert's scientific, technical, or other specialized knowledge" must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). In addition, "the testimony" must be "based on sufficient facts and data" and be "the product of reliable principles and methods." FED. R. EVID. 702(b)-(c). Finally, the expert must have "reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702(d). "The proponent of the testimony has the burden to establish these admissibility requirements." Showers, 819 F.3d at 642.

A district court has "broad discretion" in evaluating expert testimony. McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1042 (2d Cir. 1995). In carrying out its role as gatekeeper, a

court must take a "flexible" approach that focuses on "the scientific validity–and thus the evidentiary relevance and reliability–of the principles that underlie a proposed submission." Daubert v. Merrell Dow Pharms., 509 U.S. 579, 594-95 (1993). The court is to concentrate only on "principles and methodology," and "not on the conclusions that they generate." Id. at 595. Of course, "the types of factors to consider" in evaluating expert testimony "will 'depend upon the particular circumstances of the particular case at issue[.]'" Showers, 819 F.3d at 658 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999)). The trial court's role is as "'gatekeeper," making sure "that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Id. (quoting United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007)). "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions[.]" Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005). In determining whether the expert has the qualifications to testify, the court's role, "whether a witness's area of expertise was technical, scientific, or more generally 'experienced-based," is to "'[make] certain that the expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 396.

Once a court determines that an expert is qualified to testify, "Rule 702 imposes on the trial judge an obligation to determine whether the expert's specialized knowledge will assist the trier of fact, i.e., will be not only relevant, but reliable." United States v. Romano, 794 F.3d 317, 330 (2d Cir. 2015). "Expert testimony should be excluded where it is 'speculative or conjectural,' but arguments that the expert's assumptions 'are unfounded go to the weight, not the admissibility, of expert testimony.'" Robinson v. Suffolk County Police

Dep't, 544 Fed. Appx. 29, 32 (2d Cir. 2013) (quoting Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)). In determining whether expert testimony will assist the trier of fact, a court must be careful to remember that such testimony may not either "'usurp the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it[.]'" Nimely, 414 F.3d at 397 (quoting United States v. Blizerian, 926 F.2d 1285, 1294 (2d Cir. 1991). The testimony should not attempt to "'tell the jury what result to reach'" or "'substitute the expert's judgment for the jury's.'" Id. (quoting United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994)).

Dr. Knoll's expert report is part of the summary judgment record in this case. See Knoll Expert Report, Exh. 15 to Plaintiff's Response in Opposition to Defendants' Motions, dkt. # 64-17. Dr. Knoll states that he has been licensed to practice as a physician in New York State since 2006. Id. at ¶ 1. He is board certified by the American Board of Psychiatry and Neurology in Psychiatry and Forensic Psychiatry, working in active clinical practice and teaching at the State University of New York's Upstate Medical University in Syracuse, New York. Id. at ¶ 2. He also serves as Clinical Director at the Central New York Psychiatric Center in Marcy, New York. Id. He has previously provided expert testimony in state and federal courts. Id.

Dr. Knoll has worked extensively in "psychiatry, correctional psychiatry, suicide risk assessment and prevention." Id. at ¶ 3. Working as a psychiatrist, he has "regularly evaluated and treated patients at risk for suicide." Id. He has lectured on suicide risk assessment and prevention and served on state suicide prevention committees in New York and New Hampshire. Id. He has been "responsible for training Correctional Officers in suicide prevention." Id. For some period from 1997 onward, Knoll "served as a correctional

psychiatrist for the Dallas County Jail in Dallas Texas." Id. at ¶ 4. He served as director of psychiatric services for the New Hampshire State Prison system from 2001 to 2006. Id. There, he had responsibility "for suicide risk assessment and suicide prevention" for inmates in state prisons and jails. Id. He "was also responsible for crafting suicide prevent policy and procedure for the NH State Prison system." Id. As Clinical Director of the Central New York Psychiatric Center, Knoll is "responsible for suicide risk assessment and suicide prevention" for state prison inmates and jail inmates. Id. at ¶ 5. Knoll set up the suicide prevention policy at the Psychiatric Center and teaches security and the mental health staff "about suicide prevention." Id. He "regularly review[s] psychological autopsies and root cause analyses of suicide deaths of inmates in the New York Department of Corrections and Community Supervision." Id. He has served as an expert in cases involving suicide in correctional institutions acorss the United States and Canada and published articles and textbook chapters on the subject. Id. at ¶ 6.

Plaintiff retained Knoll as an expert in this case. Id. at ¶ 9. Knoll examined a variety of documents in evaluating the matter, including jail records, Decedent's death certificate, a report from the New York State Commission of Correction, recorded phone calls from the Decedent while he was incarcerated, records of discipline from Statham, and depositions in the case. Id. at ¶ 10. While Knoll finds that the "lack of an adequate suicide risk assessment" makes "[a] complete list of" Decedent's "suicide risk factors" impossible to construct, he concludes that several such factors existed during Leombruno's incarceration. Id. Such factors included, at minimum, "a substance use disorder, stress of incarceration, job loss, family stressors, chronic pain condition, male gender, access to lethal means (ligature points), giving away his possessions, recent suicidal statements and ideas (made

over the phone to his daughter)." Id. at ¶ 12. Knoll notes that Decedent "also complained of auditory hallucinations," a symptom that "was not further evaluated." Id. The Greene County Jail suicide screening report for Decedent, dated April 5, 2018, listed as factors "loss of job, worried about children, history of drug abuse." Id. at ¶ 13.

Further, a notice of discipline directed at Statham indicates that a family member had called Statham to express "'worry' that Mr. Leombruno may be suicidal." Id. at ¶ 14. Despite this telephone call, Statham did not call a mental health worker or take other action to protect Decedent. Id. The notice also lists several other "violations" committed by Defendant Statham concerning his response to the phone call: he did not brief the sergeant on the next shift about the call; he did not speak to the Decedent after receiving the call; he did not have the on-call mental-health worker speak to Leombruno; he did not move Decedent to a location where he could be more easily monitored; he left Decedent on general supervision rather than instituting a closer watch. Id. at ¶ 15. The New York State Commission of Correction found similar failings in the conduct of the Greene County Jail–the Jail "failed to take proper safety precautions" such as "placing Mr. Leombruno 'on constant supervision which could have prevented his death.'" Id. at ¶ 17.

Knoll further notes that a Greene County Corrections Grievance Form, signed by a correction officer in July 17, claimed that the Jail lacked "a proper and or up to date policy and procedure with handling mental health inmates." Id. at ¶ 18. The grievance alleged that Spitz, the Jail Administrator, "is fully aware of all the training that is required but has failed to implement this training." Id. The grievance pointed "in particular" to "suicide and suicide prevention training," which the grievant claimed "needs to be implemented as required." Id. A response by Spitz stated that the Jail's "'administration . . . sent two

employees to the first available . . . certified training for dealing with the issue of mental health [of] inmates.'" Id. at ¶ 19. The officers who attended the training, Spitz claimed, planned to set up a training program "for staff." Id. Before "this training, there were no certified instructors for the course." Id.

After summarizing deposition testimony from various Jail guards, Knoll lays out the standards of care for jails under these circumstances. He reports that jails should offer "regular suicide prevention training for staff and adequate suicide prevention policy." Id. at ¶ 25. At minimum, staff should have 4 to 8 hours of training on the subject each year. Id. Such training should assess risk factors, identification of suicidal inmates despite denials of risk, and a review of any changes to the suicide-prevention plan. Id. Those standards require that staff remain "vigilant for significant changes in an inmate's circumstances, behavior, or demeanor." Id. at ¶ 26. Guards must gather information about inmates before making any decisions about safety, lest they "needlessly endang[er] the inmate." Id. If staff have "concerning data about an inmate's suicide risk," staff should "first ensure the inmate's safety via observation and/or precautions." Id. at ¶ 27. Then staff should "engage" with the inmate "about suicidal or other concerning thoughts." Id. "[P]roper suicide precautions" should continue "at least until a trained mental health professional is able to perform an adequate, timely suicide risk assessment." Id. Since guards are not trained as professionals who can assess suicide risk, "they must be prepared to implement suicide precautions for inmates who have demonstrated concerning behaviors and risk factors for suicide." Id. at ¶ 28. Suicide assessments are essential, and should be repeated for inmates "because of the waxing and waning nature of suicidality." Id. at ¶ 29. Staff cannot simply rely on an inmate's denials; people who die by suicide often act impulsively, and they

often deny an intent if they have one. Id. at ¶ 31. Staff should ask about plans as part of an assessment, but "it is only one piece of the overall suicide risk assessment process." Id. Staff must be flexible in using risk-assessment tools, since they are not always reliable. Id. at ¶ 32. Those assessments are not meant to "a permanent marker of suicide risk, due to the fluid nature of suicidality." Id. Thus, staff should use assessments at intake, but "equally important is the determination of suicide risk by observations of current behavior displayed by an inmate throughout incarceration." Id. at ¶ 33.

Knoll reports that Defendants departed from these standards. Knoll finds that, in addition to the risk factors present at the beginning of his incarceration, "staff had more recently become aware of" several other "concerns" that required attention. Id. at ¶ 34. Knoll points to: "[c]oncerned calls" to the Jail by a family member "reporting that" Decedent "had made recent suicidal statements"; the fact Leombruno "gave away his commissary"; an observation by Statham that Decedent "seemed very upset"; and Decedent's "complaint of suffering from auditory hallucinations." Id. Statham also finds that the Jail "fell below acceptable standards by failing to implement regular, annual suicide prevention training or adequate suicide prevention policy." Id. at ¶ 35. In his deposition, Sptiz admitted that the jail did not have formal or specific training on the subject, and it took a grievance to remind Spitz of the need for such practices. Id.

Knoll also finds that Statham failed to recognize and act on several "basic, crucial suicide prevention concepts taught annually to Correctional Officers across the country." Id. at ¶ 36. He notes that: Statham "believed that an inmate must state or indicate that he is going to 'kill himself' in order to be at risk for suicide"; his false belief that a lack of a previous suicide attempts equated to a lower risk of suicide, when most suicide deaths are

not preceded by an earlier attempt; his mistaken understanding that prevention measures are necessary only when the risk of death is "grave"; Statham's failure to ask Decedent if he intended to commit suicide because of a misunderstanding about whether he could ask the question when an inmate was not in "dire circumstances"; his failure to call in mental health staff to help assess Leombruno after he heard "clear concerns" about him; and Statham's admitted lack of proper training in suicide prevention. Id. Knoll also finds that Statham "failed to communicate critical information" to officers on the next shift, and left them in the dark about Decedent's "recent emotional turmoil and concerning behaviors." Id. at ¶ 37. This failing left Decedent without "proper safety precautions and timely suicide risk assessment by qualified mental health staff." Id.

Defendant argues that the Court should find Dr. Knoll's report and testimony inadmissable, or, in the alternative, hold a Daubert hearing to determine admissibility. Defendant offers several grounds to support this argument. He does not argue that Dr. Knoll is not qualified to testify. Given Knoll's qualifications, training, and experience, the Court would reject that argument even if Defendant made it. See Resume of Dr. James Knoll, Exh. 16, to Plaintiff's Response in Opposition to Defendants' Motions, dkt. # 64-18. The Court will address the other arguments in turn. `

**i. Reliability**

Defendant contends that Dr. Knoll's opinions are not based on "scientific methodology, but, rather . . . his purported knowledge and/or experience." Defendant contends that the report lacks a proper basis because Knoll failed to consider what Statham actually knew at the time in question, and failed to consider what a reasonable officer in his position should have known under the circumstances. Knoll, Defendant claims, also failed

to opine on what Statham should have done under the circumstances. Moreover, Defendant asserts that Dr. Knoll's report misrepresents the evidence in the case, makes unwarranted assumptions, and selectively cites the record. He cites to a number of findings in the report that represent "impermissible '20/20' hindsight 'analysis'–of select 'data' hand-piked by Plaintiff's counsel, with no accounting for alternative explanations" and argues that "Dr. Knoll's discussion of only the evience that he believes would advance Plaintiff's position" makes the report "inherently suspect and lack[ing] 'intellectual rigor' sufficient to demonstrate the reliability of his 'methodology.'" These failings mean that the report is advocacy, not expert evaluation, and should be precluded.

The Court is unpersuaded by these arguments. First, the Court finds that Dr. Knoll's expertise includes suicide risks for inmates and indications of such risks. That expertise also includes knowledge of methods to prevent suicide in prison, including training of guards, and establishing procedures and systems for evaluating and mitigating risk. Defendant does not challenge his training or qualification. Knoll is certainly qualified by such expertise to opine on whether the prison had proper policies and procedures in place to prevent suicides, and on whether Defendant Statham took proper measures to Protect Leombruno's safety based on the information Defendant had at the relevant time. Second, while the Court acknowledges that there are factual disputes about exactly what knowledge Statham had, what Leombruno told his daughter, what information Douglas provided in his telephone call, and what health issues Leombruno had, the fact that factual disputes exist about that information does not mean that Knoll's report is so unreliable that the Court cannot permit a jury to hear such evidence. Such quarrels about Knoll's interpretation of the evidence and the conclusions he draws therefrom can be explored at trial, since

"[q]uestions about the weight or the sufficiency of the evidence upon which the expert relied, or upon the conclusions generated therefrom, are for cross-examination." CTI Group/Business Credit, Inc. v. Graco Fishing & Rental Tools, Inc., 815 F. Supp.2d 673, 676 (S.D.N.Y 2011). The Court is confident that Defendant's cross-examination will expose any weaknesses in the expert report to the jury.

**ii. Reliability of Data Upon Which Report is Based**

Defendant next argues that the Court should reject Dr. Knoll's opinions because they are based on unreliable data. He contends that Knoll's opinions "rest entirely upon inadequate factual foundations, problematic assumptions, and a misleadingly partial selection of relevant facts (and sources thereof)." Defendant points out that: Knoll did not examine all of the telephone calls that Leombruno made from the Jail, but only portions provided by Plaintiff's counsel; Knoll did not listen to the calls that Statham reviewed on April 12, 2018, even though he acknowledged that his understanding would have benefitted from hearing them; he did not know how much of the total calls he reviewed were represented by the excerpts he received; he did not review deposition transcripts from a mental health provider or Decedent's family; he misunderstood who called the Jail and made assumptions about what that call contained; Knoll may have overstated the concerns about suicide that the calls represented; Knoll assumed that records that showed Decedent had a prescription for Suboxone demonstrated that Decedent had an opioid addiction; Knoll simply assumed that the call to the Jail expressed a risk of suicide or concerns about Decedent's well-being; Dr. Knoll relied improperly on hearsay from Officer Schlenker in formulating his opinion; and Dr. Knoll improperly relied on the State of New York's report on Leombruno's death.

The Court will deny the motion in this respect as well. First, many of the Defendant's claims about the reliability of the information in question are disputed issues of fact which the jury would be required to decide. What Douglas told Statham, for instance, and thus what Statham knew about Decedent's mental state, is a question of fact. Second, how many and how much of the telephone calls Knoll heard before writing his report is a subject for cross examination. Defendant can ask Dr. Knoll whether other statements made by Leombruno before his death would have altered his perspective and can cross-examine him about whether his report properly represents the contents of the conversations he did examine. Defendant's attacks on the report in this respect go to the persuasiveness of Dr. Knoll's opinions, not their admissibility. Third, Defendant's complaints about Knoll's reliance on hearsay and the State Report also fail. "[E]xperts can testify to opinions based on inadmissible evidence, including hearsay, if 'experts in the field reasonably rely on such evidence in forming their opinions.'" United States v. Mejia, 545 F.3d 179, 197 (2d. Cir. 2008) (quoting United States v. Locasio, 6 F.3d 924, 938 (2d Cir. 1993)). An "expert may not, however, simply transmit that hearsay to the jury," but must instead "form his own opinion by 'applying his extensive experience and reliable methodology' to the inadmissible materials." Id. (quoting United States v. Dukagjini, 326 F.3d 45, 58 (2d Cir. 2003)). To do otherwise would permit the proponent of the evidence to "'circumvent the rules prohibiting that hearsay.'" Id. (quoting Dukagjini, 326 F.3d at 58-59). Dr. Knoll's report applies his expertise on prison mental health and suicide risk management, as well as suicidial ideation, to the statements in question. He does merely not attempt to place hearsay before the jury in an effort to avoid the rules. Likewise, Knoll does not simply adopt the State report's conclusions, but instead uses the report to inform his own understanding of

the events.

The Court will deny the motion in this respect as well.

**iii. Aid to the Court**

Defendant next argues that, even if admissible, the report will not aid the Court in reaching any decisions. The report here, Defendant claims, will not assist the trier of fact to determine whether Statham violated Decedent's constitutional right to be free of deliberate indifference to a serious medical need, and is therefore inadmissible. Defendant does not address whether the report will address Plaintiff's state-law negligence and wrongful death claims.

Defendant here seems to argue that Knoll's report is inadmissible because he did not opine that Statham's conduct in failing to institute a suicide watch immediately, notify a mental health expert of what he had learned, or inform the next shift of concerns about Decedent, amounted to deliberate indifference to a serious medical need. Instead, Knoll concludes that Statham's conduct fell below the standard of care, which addresses a different legal issue. Federal Rule of Evidence 702 makes admissible qualified expert testimony that "will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702. With reference to whether expert testimony will assist a trier of fact, the Second Circuit Court of Appeals has "consistently held . . . that expert testimony that will 'usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it' by definition does not 'aid the jury in making a decision'; rather, it 'undertakes to tell the jury what result to reach,' and thus 'attempts to substitute the expert's judgment for the jury's.'" Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005) (quoting, in turn, United States v. Bilzerian, 926 F.2d

1285, 1294 (2d Cir. 1991) and United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) (internal citation omitted)).

The Court rejects this argument. The Court will instruct the jury as to the sort of conduct that would amount to deliberate indifference to a serious medial need, as well as the standards for finding a party negligent. Here, the expert report will help the jury to both understand the evidence and determine a fact in issue. Dr. Knoll's report addresses how Statham responded to reports that Decedent may have considered harming himself, as well as the way the Jail trained guards to respond to such reports. Explaining how the Defendants' conduct here compared with national standards for dealing with potential suicides in jails and prisons will help the jury determine whether Defendants' conduct fell below appropriate standards, and whether that conduct fell so far below the appropriate standards as to violate Decedent's constitutional rights. The motion will be denied in this respect as well.

**iv. Unfair Prejudice**

Finally, Defendant argues that the prejudicial effect of the evidence substantially outweighs its probative value and should be precluded pursuant to Federal Rule of Evidence 403. Because the evidence does not address the issue of deliberate indifference, Defendant claims, admitting the testimony would "result in undue delay, waste of time, and the needless presentation of cumulative evidence" and "obfuscate the relevant questions before the Court as to Statham's deliberate indifference."

The Court reads this argument as another version of Defendant's argument that the expert testimony would not assist the trier of fact, and rejects the argument for the reasons stated above. In addition, the Court finds that evidence about the ways that jails should set

up programs and procedures to prevent suicide, the way that guards should respond to reports of inmate distress, and the ways that prison guards should communicate with each other are central questions in this case. Testimony that indicates that Decedent died by suicide in part because the Jail did not have adequate procedures and training in place and because Statham did not act in the face of an obvious danger is far more probative than prejudicial. The Court will deny the motion in this respect as well.

The Court sees no need to conduct at Dabuert hearing here. The Court has read the expert report and deposition testimony produced by Dr. Knoll. All parties agree that he is qualified to testify as an expert. The Court has determined that his report is based on reliable data and will assist the trier of fact. Further testimony on this issue will not alter the Court's opinion.

**B. Defendant Statham's Motion**

Defendant Christopher Statham moves for summary judgment on several grounds, which the Court will address in turn. As a general matter, Defendant argues that no reasonable person could have thought that Leombruno was a danger to himself on April 12, 2018, and that the actions Statham took in listening to the allegedly concerning phone calls and ordering a mental-health assessment for the next day were sufficient under the circumstances. He argues that "[w]hile Plaintiff obviously hopes this Court will view the evidence through the emotion and lens of 20/20 hindsight, . . . the evidence before this Court simply does not support any liability claim against Statham."

**i. Fourteenth Amendment Claim**

Defendant first argues that he cannot be liable for any constitutional claim brought by Plaintiff because, as a matter of law, his conduct did not represent deliberate indifference to

a serious medical need. "In fact," he argues "the evidence before this Court demonstrates that in the span of less than four hours, Statham did more for ML than any member of ML's family (or any other person) did during ML's seven-day incarceration in April 2018." He argues that he investigated the concerns raised by Douglas's call, followed his training, and ordered a mental-health evaluation for the following day. Plaintiff responds that Defendant Statham had warnings from a family member of concerns that Leombruno intended to harm himself, as well as access to the phone calls that Leombruno's daughter found concerning, yet took no immediate action to protect the Decedent. Plaintiff also contends that Statham failed to contact any mental health professionals for help addressing the situation. Under those circumstances, Plaintiff claims, Stahtam's conduct amount to deliberate indifference to a serious risk of harm.

"While in custody, a pretrial detainee has a Fourteenth Amendment substantive due process right to care and protection, including protection from suicide." Kelsey v. City of New York, 306 Fed. Appx. 700, 702 (2d Cir. 2009). "A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017). This difference exists "because '[p]retrial detainees have not been convicted of a crime and thus may not be punished in any manner–neither cruelly and unusually nor otherwise.'" Id. (quoting Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007) (internal citations omitted)). "A detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" Id. (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)). "'[C]laims involving the risk of suicide have been articulated and expressed as violations of

the duty to protect, particularly when asserted against non-medical personnel[.]'" Phillillips v. Mitchell, No. 19-CV-0383, 2021 U.S. Dist. LEXIS 58834, at *9 (N.D.N.Y. Mar. 29, 2021) (quoting Allah v. Kemp, No. 9:08-CV-1008 (NAM/GHL), 2010 U.S. Dist. LEXIS 24781, 2010 WL 1036802, at *4 (N.D.N.Y. Feb. 25, 2010)). To prove a failure-to-protect claim, a plaintiff must show "both that a substantial risk to his safety existed and that" defendant acted with deliberate indifference to that risk. Id. To prove deliberate indifference, a plaintiff must either "prove that the defendant acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell, 849 F.3d at 35. This part of deliberate indifference is defined "objectively," rather than from the "subjective" perspective of the defendant. Id. "[I]n general . . . deliberate indifference [is] lacking where officers take affirmative and reasonable steps to protect detainees from suicide." Kelsey, 306 Fed. Appx. at 703.

Defendant first argues that no evidence exists by which a reasonable juror could conclude that Decedent suffered from a serious mental health condition that required care and protection. No evidence supports a finding that Leobruno had pre-existing diagnosis of a mental-health condition or opiate withdrawal, Defendant claims. The Court is unpersuaded by this argument. The evidence recounted above, taken in the light most favorable to the non-moving party, could be used by a reasonable juror to conclude that Statham had a warning from Leombruno's family that Leombruno intended to harm himself. Moreover, while the phone calls to which Statham listened are equivocal, they did cause concern for Leombruno's daughter. She knew him far better than Statham did. Further,

Dr. Knoll's report indicates that Leombruno had displayed several signs of suicide risk during his incarceration. A reasonable juror could use this information to conclude that a serious discernible risk that required reasonable care and protection existed on April 12, 2018. The Court will deny the motion on this basis.

Statham next argues that, even if such a risk existed, he did not act with deliberate indifference to such risk. He argues that no evidence exists to demonstrate that he was aware that Decedent was in serious risk of harm, and that he took reasonable actions in light of the knowledge he had. In cases of inmate suicide, "deliberate indifference arises 'under one of two broad fact situations.'" Lara-Grimaldi v. Cty. of Putnam, 529 F.Supp.3d 88, 106 (S.D.N.Y. 2021) (quoting Rellergert v. Cape Girardeau County, 924 F.2d 794, 796 (8th Cir. 1991)). The first situation takes place when "a suicide or attempt . . . occurs when jailers failed to discover the decedent's suicidal tendencies.'" Id. (quoting Rellergert, 924 F.2d at 796). The second scenario "occurs when jailers have discovered the [suicidal] tendencies and have taken preventive measures,'" which may not have been adequate. Id. quoting Rellergert, 924 F.2d at 796). The ultimate question in either scenario is whether the Defendant was deliberately indifferent to the danger of the inmate committing suicide. See Bright v. Annucci, No. 18-cv-11111, 2021 U.S. Dist. LEXIS 187075 at *43 (S.D.N.Y. Sept. 28, 2021).

In Lara-Grimaldi, a jail inmate committed suicide while suffering from opiate withdrawal. 529 F.Supp.3d at 92. Plaintiff argued that defendants were liable because they failed to discover the decedent's suicide risk. Id. at 106. The question, the court determined, was "whether a reasonable jury could find that Defendants should have known of an excessive risk that [decedent] would attempt suicide." Id. Answering "no," to this

question, the court granted summary judgment. Id. at 107. The Court concluded that "[t]he undisputed evidence–including the suicide screening form, medical intake records, and medical records from the hospital–indicate that Grimaldi denied suicidal thoughts." Id. Further, that evidence "demonstrates that [decedent] behaved normally, both at intake and on the following day prior to the attempted suicide." Id. While officers were aware that the decedent "suffered from bipolar disorder and had attempted suicide four years prior," such past conduct did not "establish a high risk of suicide." Id. Though officers knew that the decedent was experiencing drug withdrawal, the court concluded that drug withdrawal did not necessarily represent a suicide risk. Id. at 108.

Defendant points to similar evidence in this case. The evidence here indicates that the jail assessed Leombruno on intake and found no serious suicide risk. The evidence also shows that Leombruno denied any suicidal ideation when assessed. Evidence from other inmates also fails to indicate that he expressed a desire to harm himself. While there is some evidence of drug addiction in the jail records, there is no evidence that Leombruno was undergoing drug withdrawal during his time in jail. Moreover, Defendant denies that he had:

> ever met [Leombruno]; was aware of any mental health history for [Leombruno]; was aware of any history of suicide or self-harm; ever received any request for medical attention by [Leombruno]; or heard [Leombruno] declare that he was going to kill or even hurt himself.

Defendant Statham's Brief in Support of Motion for Summary Judgment, dkt. # 61-4, at 13. Statham contends that he acted reasonably given his knowledge of the situation and his authority and responsibility as a Sergeant at the Jail.

At the same time, however, there is also evidence a reasonable juror could use to

conclude that Leombruno's family made Statham aware of a serious risk that the decedent would harm himself. A jury could conclude that Douglas warned Statham that Leombruno's daughter had interpreted statements in their conversation as a threat by Decedent to kill himself. A reasonable juror could also conclude that Leombruno's daughter, who knew him well and spoke with him frequently would have good reason to believe that his threats were legitimate. Circumstantial evidence that Statham considered Douglas's call to be a warning exists in the fact that he listened to two telephone calls from April 12, 2018. From this evidence, a reasonable juror could conclude that Statham had been made aware of a serious risk that Leombruno would attempt suicide on April 12, 2018.

That same jury could also find that Statham did not take reasonable steps to protect the Decedent when presented with this information. Even without the aid of Dr. Knoll's testimony–which points to several failings in Statham's response to the situation–a jury could conclude that Statham did not respond to the situation with appropriate care. A reasonable juror could find that Statham, when warned that Leombruno intended to kill himself, failed to take even basic measures to protect Leombruno, such as ordering that he be placed on suicide watch until he could be evaluated by a mental health professional. A reasonable juror could conclude that filing a request for a mental health evaluation to be performed sometime in the future was likewise reckless under the circumstances. So too could a reasonable juror come to that conclusion about Statham's failure to warn the oncoming shift of any concerns about Leombruno's behavior.

Sufficient evidence exists for a reasonable juror to find Statham liable on Plaintiff's

Section 1983 claim, and the Court will deny the motion in this respect.[4]

### ii. Qualified Immunity

Defendant Statham next argues that, even if he could be liable for deliberate indifference, he would be entitled to qualified immunity. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Stephenson v. Doe, 332 F.3d 68, 76 (2d Cir. 2003) (quoting McCardle v. Haddad, 131 F.3d 43, 50 (2d Cir. 1997)). Qualified immunity also applies when "'it was 'objectively reasonable' for [the officer] to believe that [his or her] actions were lawful at the time of the challenged act.'" Betts v. Shearman, 751 F.3d 78, 83 (2d Cir. 2014) (quoting Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007)).

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 664 (2012). "[C]ourts may

[4] Defendant argues that the Court should not consider the report of the New York State Commission of Correction in deciding the instant motion. He argues that, while the report offers recommendations based on the events of April 12, 2018, the report fails to "examine Statham's decision making through the lens of what" he "knew on" that night. Further, he contends, the Commission has limited jurisdiction and lacks the authority to review and analyze the Fourteenth Amendment issues at stake here. "As such," Defendant argues, "the Commission of Correction['s report] is irrelevant and should be disregarded by this Court, accordingly." Defendant's Brief at 15. The Court agrees that the Commission's view on whether Statham's conduct violated Leombruno's constitutional rights is not relevant to the legal questions before Court or the issues that a jury will have to resolve in this matter. The Court has not considered the report for that purpose, and finds that the evidence contained in the report is not necessary to reach the conclusions the Court arrives at in this opinion. Defendant's arguments here do not address whether the report itself contains admissible evidence about the underlying facts of the case, and does not raise any evidentiary issues about the contents of the report. Defendant may raise such issues at an appropriate time in motions *in limine* or at trial.

grant qualified immunity on the ground that a puported right was not ‘clearly established’ by the prior case law, without resolving the more difficult question whether the purported right exists at all.” Id. “‘Clearly established’ means that, at the time of the officer’s conduct, the law was ‘sufficiently clear’ that every ‘reasonable official would understand that what he is doing’ is unlawful.” District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). As such, “existing law must have placed the constitutionality of the officer’s conduct ‘beyond debate.’” Id. (quoting al-Kidd, 563 U.S. at 741). “This demanding standard protects ‘all but the plainly incompetent or those who knowingly violate the law.’” Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). “To determine whether a right is clearly established,” a court will “‘generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation.’” Vasquez v. Maloney, 990 F.3d 232, 238 (2d Cir. 2021) (quoting Garcia v. Doe, 779 F.3d 84, 92 (2d Cir. 2015)). “When analyzing whether the right violated was ‘clearly established,’ the Supreme Court has repeatedly (and recently) reminded us that clearly established law must be ‘particularized’ to the facts of the case and must not be defined at a high level of generality.’” Naumovski v. Norris, 934 F.3d 200, 211 (2d Cir. 2019) (quoting, in turn, White v. Pauly, 137 S.Ct. 548, 552 (2017); Kisela v. Hughes, 138 S.Ct. 1148, 1152 (2018)). Defendant argues that no clearly established law existed in the Supreme Court or the Second Circuit in 2018 that would have informed Statham that “taking the investigative steps” he did “and submitting a Mental Health Referral Form to facilitate” Leumbruno “being assessed . . . violated [Decedent’s] constitutional rights under the Fourth [sic] Amendment.” He contends that the Court should ask one of two questions in the qualified immunity context:

> As of April 12, 2018, was there clearly established law in this Circuit that a correction officer being alerted to a concern (even a concern of self-harm) by a family member of an inmate was required to place the inmate on constant watch (as distinguished from other measures such as a mental health referral) where the inmate made no requests for medical care and had no history of mental health conditions or suicide?

or

> As of April 12, 2018, was there clearly established law in this Circuit that a correction officer being alerted to a concern (even a concern of self-harm) by a family member of an inmate, prompting the correction officer to listen to the phone calls identified by the family member reviewing the inmates intake records and preparing and submitted [sic] a Mental Health Referral form (because he interpreted the inmate to be very upset) so the inmate would be assessed by a mental health professional the following morning–nonetheless violated the inmate's rights to access medical care under the 14th Amendment?[5]

Defendant Statham's Brief, dkt. # 61-4, at 17-18 (punctuation altered). Defendant contends that the "controlling law" in this Circuit would have informed him that his conduct was appropriate and did not violate Fourteenth Amendment. Plaintiff responds that the law in this Circuit has clearly established that a correction officer may not act with deliberate indifference when that officer is aware of a strong likelihood that the prisoner will commit suicide without direct action. Defendant replies that Plaintiff's formulation of the issue is too generic and contrary to Supreme Court and Circuit precedent requiring that the qualified immunity question be addressed at a more specific level.

Defendant is correct that qualified immunity must be evaluated in light of the specific facts of the case and the Court must not define the right in question in a highly generalized

---

[5]In reply, Defendant offers a third formulation: "As a matter of law Statham is immune from suit since there was no clearly established law on April 12, 2018 that would have informed a reasonable corrections sergeant in Statham's shoes that completing and submitting a mental health referral form for an angry and upset detainee with no mental health or suicide history violated his 14th Amendment right." Defendant's Reply Brief, dkt. # 65-1, at 12.

way. Here, the Court would violate that rule by defining the right in question as an inmate's right to be protected from a risk of suicide. Defining the right in that way would exclude any jail official present at the time of an inmate suicide ineligible for qualified immunity. That would undermine the purpose of qualified immunity and explains why the "clearly established law" in question "must be particularized' to the facts of the case[.]" Naumovski, 934 F.3d at 211 (internal citation omitted). At the same time, qualified immunity is qualified, not absolute, and "[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." Thomas v Roach, 165 F.3d 137, 143 (2d Cir. 1999). Here, Defendant attempts several times to lay out factual situations that faced him on April 12, 2018, and which indicate that the Decedent's constitutional rights were not clearly established in those situations. He contends that no case law existed that indicated that he had to take specific measures when presented with information about an inmate who presented a risk of suicide. The way that Defendant frames those questions, however, assumes as true facts that are in dispute, such as what information Leombruno's family provided him about Decedent's condition, and how he and the other officer who listened to the recorded phone calls interpreted them.

Defendant does not deny that, in a general sense, clearly established law provided that he had an obligation to protect the safety of an inmate who presented a risk of suicide, and that failing to act reasonably to protect an inmate he knew was likely to harm himself would violate that inmates rights. Many of the facts he relies on to assert qualified immunity, such as how much information he received about Leombruno's desire to harm himself and how the other guard who listened to the recorded phone conversations interpreted Leombruno's mental state, and the relation of the measures he took to the

amount of risk that the Decedent present, are in dispute. Under those circumstances, qualified immunity is not appropriate. See, e.g., Case v. Anderson, No. 16 Civ. 983, 2017 U.S. Dist. LEXIS 137118, at *46 (S.D.N.Y. Aug. 25, 2017) (qualified immunity unavailable in detainee suicide case where plaintiff alleged defendants' knowledge of suicide risk and their deliberate indifference to that risk, since "the right of those in state custody 'to be free from deliberate indifference to [their] serious medical needs has been established for decades.'") (quoting Randle v. Alexander, 170 F.Supp.3d 580, 596 (S.D.N.Y. 2016); Kelsey v. City of New York, No. 03-CV-5978, 2006 U.S. Dist. LEXIS 91977, at *30 (E.D.N.Y. Dec. 18, 2006)("pretrial detainee's right to be free from deliberate indifference by police officers to suicide, *while in custody*, is a clearly established right.") (emphasis in original). Defendant may of course revisit the issue of qualified immunity at an appropriate time later in the litigation.

**C. Negligence and Wrongful Death**

Defendant Statham next argues that he cannot be liable on Plaintiff's negligence and wrongful death claims because no evidence exists to support a finding that Leombruno's death was reasonably foreseeable. Moreover, he contends, he had met the duty of care required of him when, as promised, he "looked into" the concerns that Douglas raised during their telephone call. Plaintiff responds that evidence supports a finding of deliberate indifference, and that such evidence also supports a negligence claim. Both sides appear to agree that the Court should use the same standards to evaluate negligence and wrongful death.

"In New York, a plaintiff offers prima facie evidence of negligence when he shows that "(1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant

breached that duty; and (3) the plaintiff suffered damage as a proximate result." Williams v. Utica Coll. of Syracuse Univ., 453 F.3d 112,116 (2d Cir. 2006). During incarceration, "a duty of care is owed by prison authorities with respect to the health and safety of their charges." Gordon v. New York, 70 N.Y.2d 839, 840 (1987). "When prison authorities know or should know a prisoner has suicidal tendencies or that a prisoner might physically harm himself, a duty arises to provide reasonable care to assure that such harm does not occur." Id. "Whether a breach of duty has occurred depends upon whether the resulting harm was a reasonably foreseeable consequence of the defendant's acts or admission." Id. at 841. If the Defendant could not have "reasonably foreseen" the injury, "or if defendant's conduct was reasonable in light of what could have been anticipated, there is no breach of duty, no negligence, and no liability." Id.

The Court will deny the Defendant's motion on these grounds as well. As explained above, evidence exists by which reasonable jurors could find that Statham knew or should have known that Leombruno presented a risk of suicide on July 12, 2018, and that Statham did not act in a reasonable way to prevent that suicide. If a reasonable juror came to that conclusion, that juror could find that Statham breached his duty to the Decedent and that his breach caused Leombruno's death. Whether the information Statham had made Leombruno's death by suicide reasonably foreseeable, and whether Statham took reasonable steps in response to the information he received by listening to telephone calls and filling out a request for a mental health evaluation for the next day are questions for the jury.

### D. Punitive Damages

Statham next argues that evidence could not support a claim for punitive damages

and contends that the Court should strike such damages from the case. He asserts that punitive damages are unavailable because no evidence indicates that Statham acted with malice or evil motive, or in a way that any reasonable could find wanton. Plaintiff responds that Statham's conduct in this case amounted to failure to act in the face of an obvious and known risk of suicide constitutes the sort of conduct for which punitive damages are available under both state and federal law.

On a federal claim, Punitive damages may be recovered "'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983). "To be entitled to an award of punitive damages, a claimant must show a 'positive element of conscious wrongdoing.'" New Windsor Volunteer Ambulance Corps., Inc. v. Meyers, 442 F.3d 101, 121 (2d Cir. 2006) (quoting Kolstad v. American Dental Ass'n, 527 U.S. 526, 538 (1999)). Still, for a jury to consider punitive damages, "[t]he plaintiff['s] evidence need only be enough 'to permit the factfinder to *infer* that the responsible official was motived by malice or evil intent or that he acted with reckless or callous indifference.'" Cameron v. City of New York, 598 F.3d 50, 69 (2d Cir. 2010) (quoting New Windsor Volunteer Ambulance Corps., 442 F.3d at 122)) (emphasis in original).

In New York, '[p]unitive damages . . . are awarded to punish a defendant for wanton and reckless or malicious acts and to protect society against similar acts.'" In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 725 F.3d 65, 127 (2d Cir. 2013) (quoting Rivera v. City of New York, 40 A.D.3d 334, 836 N.Y.S.2d 108, 117 (1st Dept. 2007)). New York courts have varied in their description of conduct justifying punitive damages "'but,

essentially, it is conduct having a high degree of moral culpability which manifests a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" Id. (quoting Home Ins. Co. v. American Home Prods. Corp., 75 N.Y.2d 196, 203, 550 N.E.2d 930, 551 N.Y.S.2d 481 (1990)). Defendant's "conduct need not be intentionally harmful but may consist of actions which constitute wilful or wanton negligence or recklessness." Id. (internal citations omitted). A jury may award punitive damages when "the defendant 'acted with actual malice involving intentional wrongdoing' or where such conduct amounted to a 'wanton, willful or reckless disregard of plaintiffs' rights.'" Id. (quoting Ligo v. Gerould, 244 A.D.2d 852, 665 N.Y.S.2d 223, 224 (4th Dept. 1997)). Punitive damages must serve as a "'social exemplary remedy'" and are therefore appropriate for conduct "'sufficiently blameworthy' that punishing it 'advance[s] a strong public policy of the state.'" Id. at 128 (quoting Randi A. v. Long Island Surgi-Ctr., 46 A.D.3d 74, 842 N.Y.S.2d 558, 564 (2d Dept. 2007)). "The concept of punitive damages has been sanctioned under New York law in actions based on negligence[.]" Home Ins. Co., 75 N.Y. 2d at 204 (citing Wittman v. Gilson, 70 N.Y.2d 970, 972 (1988); and Caldwell v. New Jersey Steamboat Co., 47 N.Y. 282, 296 (1872)).

The Court will deny Statham's motion in this respect as well. As explained above, sufficient facts exist for a reasonable juror to conclude that Statham ignored clear warnings that Leombruno intended to harm himself, taking no reasonable actions to protect him. Such a reasonable juror could find that conduct extreme and outrageous and award punitive damages.

**C. Motion of Defendant County of Greene**

Defendant County of Greene likewise seeks summary judgment on Plaintiff's claims

on various bases, which the Court will address in turn.

**i. Monell Claims**

The County first argues that the Court should grant Defendant judgment on Plaintiff's municipal liability claims. Defendant contends that no evidence supports a finding that the jail intake screening procedures and policies were inadequate, nor that the training the County provided guards was inadequate. Moreover, Defendant claims, Plaintiff has failed to point to any inadequacies in Statham's training. Plaintiff responds that the Jail's policies were inadequate because they permitted an unqualified person–Statham–to make a judgement about the threat of suicide Leombruno presented. Plaintiff also claims that the Jail's training of officers concerning suicide risks was not adequate. She points out that depositions revealed that officers were not familiar with the Jail's suicide prevention policy, that they did not receive any follow-up training after training shortly after hiring, and argues that failing to provide more extensive training led to an inadequate reaction to Leombruno's condition.

Municipal liability is limited under Section 1983 by Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). In that case, the Supreme Court found that municipal liability existed "where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006). To prevail, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Bd. of County Commr's v. Brown, 520 U.S. 397, 403 (1997). "A government's official policy may be 'made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 142 (2d Cir. 1999) (quoting Monell, 436 U.S. at 694). In

addition, "[m]unicipal liability may . . . be premised on a failure to train employees when inadequate training 'reflects deliberate indifference to . . . constitutional rights.'" Okin v. Vill. of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 440 (2d Cir. 2009) (quoting City of Canton v. Harris, 489 U.S. 378, 392 (1989)). To demonstrate such deliberate indifference, the plaintiff must demonstrate "(1) 'that a policymaker knows to a moral certainty that her employees will confront a given situation'; (2) 'that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation'; (3) 'that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights.'" Id. (quoting Walking v. City of New York, 974 F.2d 298, 297-98 (2d Cir. 1992)).

Dr. Knoll's report concludes that:

> 25. For over a decade, the applicable standard for jails has been regular suicide prevention training for staff and adequate suicide prevention policy. The minimum standard is annual suicide prevention training of at least 4 to 8 hours. In 2010, the National Institution of Corrections reported:
>
> Correctional administrators should ensure that suicide-prevention training curricula are developed . . . and that all correctional, medical, and mental health personnel receive regular and comprehensive instruction in suicide-prevention methods . . . Annual refresher training should include a review of administrator and staff attitudes about suicide . . . predisposing risk factors, warning signs and symptoms, how to identify suicidal inmates despite a denial of risk, and a review of any changes ot the facility's suicide-prevention plan. The annual training should also include a general discussion of any recent suicides and/or suicide attempts in the facility.
> . . .
>
> 35. It is my opinion with reasonable medical certainty that the Greene County Jail Superintendent Spitz fell below acceptable standards by failing to implement regular, annual suicide prevention training or adequate suicide prevention policy. Superintendent Spitz reported that there was no "formal" or "specific training" on suicide prevention at the Greene County Jail. He was reminded of the need to implement suicide prevention traning by Officer Mokszycki, yet still failed to ensure training or adequate policy.

Knoll Report at ¶ 25, 35. Knoll points to the deposition of Superintendent Spitz, who "testified that there was no formal training provided at the Greene County Jail for suicide prevention. Further, booking officers were not provided with any specific training on suicide risk assessment." Id. at ¶ 20. Statham testified that he did not have any training on suicide prevention in Greene County, though he had some training on the issue earlier in his career in corrections. Id. at ¶ 24. He testified that he did not feel he had received "adequate suicide and suicide prevention training at the Green County Jail prior to April 12, 2018." Id.

Greene County argues that Plaintiff's Complaint points to two types of Monell liability: the existence of County policies or customs that injured Leombruno, and a failure to train officers in proper suicide prevention policy. Plaintiff responds that the County's motion should be denied on several bases. First, Plaintiff points to testimony from the Greene County Sheriff that indicates that Statham "didn't follow the Suicide Policy completely." A failure to follow a jail policy does not indicate that the policy was inadequate, and this argument provides no basis for denying the motion. Plaintiff points out, however, that, "despite" a "direction to place a prisoner on constant watch 'if a family member communicates their knowledge of [suicidal] intent,' Jail policy allowed Statham to review the phone calls after receiving Douglas's call and make a 'judgement decision' on what to do." Id. Plaintiff contends that "[t]his testimony confirms that County policy allowed this unqualified person to make a judgment call on whether a constellation of indications amounted to a real suicide threat or something manipulative and not immediately pressing." Such a practice, Plaintiff claims, "is sufficient to hold the County liable."

The Court will grant the motion on this basis. While there is some evidence that the Jail's stated policies related to suicide prevention were not as robust as they could be,

Plaintiff's expert report does not offer any specific analysis as to why those policies fell below an acceptable standard and caused Leombruno's death. Plaintiff also fails to offer any evidence of the frequency of suicide attempts at the jail, nor does he offer evidence that supports a claim that failing to respond to concerns raised by family members was a policy or practice. Likewise, he offers no expert opinion to support a claim that permitting a guard to use judgment about the contents of recorded calls amounts to an inadequate policy or practice that would expose the County to liability. Without expert testimony explaining exactly the failings in the procedures and policies the Jail implemented to protect against suicide, and without evidence of a practice and policy outside of this particular case of guards ignoring suicide risks, the Court cannot find that the County could be liable for a policy or practice that violated Defendant's rights.

At the same time, however, there is evidence in the testimony of guards and Plaintiff's expert report to find that a reasonable juror could find the Defendant County liable for failure to train jail guards in suicide prevention. The evidence indicates that no such regular training occurred, and Plaintiff's expert indicates that a proper suicide prevention policy would include such training. The Court disagrees with the Defendant County, which claims that, because State law did not require additional training, a jury could not find deliberate indifference. As explained, finding deliberate indifference requires proof "(1) that a policymaker knows to a moral certainty that her employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; (3) that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights." Okin, 577 F.3d at 440 (internal

quotations omitted). Making all inferences in the Plaintiff's favor, the evidence in this case indicates that suicide in jails is a national problem that Defendant was aware of, that adequate training would help guards address the complex mental-health situation presented by the risk of jail suicide, and that failing to address properly suicide risks can deprive a suicidal inmate of his constitutional rights in jail. While Defendant may argue at trial that officers received adequate training under the circumstances, that question is for the jury.

The County also argues that a grant of summary judgment to Statham on the Section 1983 claim against him would relieve the County of any responsibility for Plaintiff's Monell claim. The Court agrees, but has already concluded that a reasonable juror could find Statham liable on that claim. The Court will therefore deny the motion on that basis as well.

The Court will therefore deny the motion in this respect and allow a jury to determine whether the County deprived the Decedent of his constitutional rights by failing to provide guards with sufficient suicide-prevention training.

**ii. Wrongful Death**

The County next asserts that Plaintiff cannot prevail on her wrongful death claim against the County because no evidence supports any finding of pecuniary loss by Leombruno's heirs. Defendant contends that the evidence indicates that Leombruno was not employed when he died, and that he and his children resided rent free with Plaintiff at the time of his death.

Defendant is correct that an action for wrongful death in New York requires a showing of "pecuniary" damages, which are distinct from "'those losses which result from the deprivation of the society and companionship of relatives, which are equally incapable of being defined by any recognized measure of value.'" Gonzalez v. New York City Housing

Authority, 777N.Y.2d 663, 667 (N.Y. 1991) (quoting Tilley v. Hudson Riv. R.R. Co., 24 NY 471, 476 (N.Y. 1862)). That rule limits the recovery of damages for wrongful death to "the plaintiff's reasonable expectancy of future assistance or support by the decedent [which] was frustrated by the decedent's death." Id. at 668. As such, "[l]oss of support, voluntary assistance and possible inheritence, as well as medical and funeral expenses incidental to death, are injuries for which damages may be recovered." Id.

Plaintiff responded to Defendant's motion with exhibits that showed such pecuniary loss. See dkt. #s 64-10, 64-11, and 64-12. Included in those exhibits were pay records, a funeral bill, and the report of Andrew Weintraub, an economist. See id. Weintraub, using life expectancy tables, wage records, and data from the Bureau of Labor Statistics, offers numerical calculations of lost past and future earnings. See dkt. # 64-12. Faced with this information, the County does not address Plaintiff's assertion that she has provided sufficient proof for a jury to find pecuniary loss.

The Court finds this evidence sufficient for a reasonable juror to find that pecuniary loss occurred, and the Court will deny the motion in this respect as well.

**D. Plaintiff's Motion**

Plaintiff seeks summary judgment on her Section 1983 and state-law claims against both Statham and the County. Defendants oppose the motion. The Court need not repeat the facts or the legal standards here, and will address the parties' arguments, as necessary.

**i. Statham**

Plaintiff first seeks summary judgment on her constitutional claim against Statham. She contends that she is entitled to summary judgment on her Section 1983 claim because Statham took no action to protect Leombruno and therefore can be no question that he is

liable for failing to protect the decedent.

The Court will deny the motion in this respect. As explained, the evidence indicates that questions of fact exist as to what Statham knew of Leombruno's condition and whether the actions he took in light of that knowledge were reasonable under the circumstances. A jury must decide those question, not the Court.

Plaintiff also argues that the evidence establishes that Decedent's suicide was reasonably foreseeable and that Statham's inaction in the face of this threat entitles the Plaintiff to summary judgment on her state-law claims. Because, as explained, the facts surrounding Statham's knowledge about Decedent's mental state and intentions at the relevant time are in doubt, and because the reasonableness of his actions in light of whatever knowledge he had are also in question, summary judgment for the Plaintiff is inappropriate on these state-law claims too.

**ii. County of Green**

To the extent that Plaintiff seeks summary judgment against the County of Greene on her Section 1983 claims, the Court will deny that motion. As explained, questions of fact exist as to whether the County could be liable for failure-to-train, and the Court will leave that question for the jury. Plaintiff also asserts that the County can be liable in *respondeat superior* for her negligence claims, and that she is entitled to summary judgment on that claim against the County for the same reasons she entitled to such judgment against Statham. For the same reasons that the Court denies summary judgment against Statham on those claims, the Court denies summary judgment against the County.

For those reasons, the Plaintiff's motion for summary judgment will be denied.

## IV. CONCLUSION

For the reasons stated above, the Defendant County of Greene's motion for summary judgment, dk. # 60, is hereby GRANTED with respect to Plaintiff's Section 1983 Monell claim as that claim relates to a policy, practice, or custom and DENIED in all other respects. Defendant Statham's motion for summary judgment, dkt. # 61, is hereby DENIED. Plaintiff's motion for summary judgment, dkt. # 64, is hereby DENIED. Defendant Statham's motion to strike Plaintiff's expert report or for a *Daubert* hearing, dkt. # 66, is hereby DENIED.

**IT IS SO ORDERED.**

Thomas J. McAvoy
Senior, U.S. District Judge

Dated: January 25, 2022